IN RE ESTATE OF WILLIAM A. SCOVILLE, DECEASED. FRANK P. JESSUP ET AL., APPELLEES, v. FLOSSIE WENSKY, APPELLANT.

31 N. W. 2d 284

Filed March 12, 1948.    No. 32284.

416

*Torgeson & Halcomb* and *Bernard O'Brien,* for appellant.

*Kuns & Van Steenberg* and *W. H. Kirwin,* for appellees.

Heard before SIMMONS, C. J., PAINE, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ., and KROGER, District Judge.

MESSMORE, J.

This is a will contest in which the validity of an instrument purporting to be the last will and testament of William A. Scoville, deceased, and a codicil thereto, is involved.

The will and codicil were admitted to probate in the county court over objections of the contestant, a daughter of the deceased. The objections to the probate of the will and codicil were that the instruments were not executed as required by law, and not properly attested; that at the time of the making and executing of the instruments the testator was not possessed of sufficient mental or physical capacity to so make and execute such instruments, by reason of old age and infirmity; and that undue influence was exerted upon the testator by his daughter, Orpha Cross, and her husband. From admission of the will and codicil to probate in the county court, the case was appealed to the district court and, by stipulation, tried on the pleadings filed in the county court. At the close of all the evidence in the district court, the proponents moved for a directed verdict, which was sustained. The district court entered judgment for the proponents and decreed the will and codicil thereto to be the last will of William A. Scoville, deceased. Upon the overruling of the motion for new trial, the contestant appeals.

The contestant predicates error in that the district court did not submit the case to the jury on the issues presented in the objections to probate. Under this as-

signment of error, the question to determine is the sufficiency of the evidence to warrant submission of the case to the jury on the issue of testamentary capacity, or undue influence, or both.

In considering this question it is necessary to have in mind certain legal principles governing testamentary capacity, as follows: The mental capacity of .a testator is tested by the state of his mind at the time he executed his will. If the testator knows the extent and character of his property, the natural objects of his bounty, and the purposes of his devises and bequests, he is mentally competent to make a will. See In re Estate of Laflin, 108 Neb. 298, 187 N. W. 885; In re Estate of Frazier, 131 Neb. 61, 267 N. W. 181; In re Estate of Bose, 136 Neb. 156, 285 N. W. 319; In re Estate of Inda, 146 Neb. 179, 19 N. W. 2d 37; In re Estate of Winch, 84 Neb. 251, 121 N. W. 116; In re Estate of Johnsen, *ante* p. 34, 30 N. W. 2d 70.

In the instant case, the proponents made a prima facie case in substance as follows: The attorney who drafted the will in question and the codicil thereto testified that he had been acquainted with the testator since October 1942, until his death; that he saw him from 10 to 12 times a year; that on the occasion of the execution of the will and codicil, the testator knew the objects of his bounty, what he was doing, and possessed testamentary capacity. This attorney also witnessed the will. A banker who was acquainted with the testator for a number of years, as a witness to the will, testified that the testator knew that he was executing a will, and at the time was of sound mind. One of the witnesses to the codicil, made and executed on November 2, 1944, testified that William A. Scoville knew who his heirs were, where his land was located, and what he was doing at the time he executed the codicil. To the same effect was the testimony of another witness to the codicil. Other details need not be set out.

If the proponent makes a prima facie case as to testa-

mentary capacity, it then devolves upon the contestant to overcome the presumption arising therefrom after which the burden of going ahead and proving testamentary capacity by a preponderance of the evidence devolves upon the proponent. See In re Estate of Witte, 145 Neb. 295, 16 N. W. 2d 203, and cases hereinbefore cited in this opinion.

It is well established in this jurisdiction that upon a motion for a directed verdict at the conclusion of all of the evidence, the motion must be treated as an admission of the truth of all of the material and relevant evidence admitted and all proper inferences to be drawn therefrom. See Curtice Co. v. Estate of Jones, 111 Neb. 166, 195 N. W. 930.

With the foregoing legal principles in mind we set forth the relevant and material evidence, not in detail but sufficiently to discern the contestant's view thereof to sustain her contention with reference to the errors complained of.

The testator, William A. Scoville, commonly referred to as W. A. Scoville, engaged in farming in Banner County, Nebraska, since about 1907. He was a cripple since early life, and in later life wore glasses and became hard of hearing. His family consisted of his wife and three daughters who were living at the time the will in question was made and executed; two daughters who predeceased the testator; also a son, W. B. Scoville, unmarried and referred to in the record as Bud, who died in August 1942; and certain grandchildren. During his lifetime, Bud Scoville lived with and resided with his parents on the home place, and for a number of years prior to his death farmed the land owned by his father and a half section which he owned, under an arrangement whereby, after deducting certain expenses, the net proceeds were divided equally between the father and son.

Our attention is directed to three wills, each made in close proximity with the other. One is dated in Sep-

tember 1942, in which the testator devised the home place, consisting of 160 acres, to the contestant, and to her son, Robert Wensky, 80 acres. He bequeathed to his daughters, Jessie McArthur and Orpha Cross, each $1,000, and made certain bequests to four grandchildren. The three living daughters were made residuary legatees upon the death of the testator's wife, a trust having been set up in the will for her benefit.

On July 8, 1943, the testator made and executed a will wherein he devised to the contestant 160 acres as set forth in the will of September 1942, and to his daughter, Orpha Cross, 80 acres which he had previously devised to the contestant's son, Robert Wensky; canceled the $1,000 bequest to Orpha Cross, and removed the contestant as a residuary legatee.

With reference to the devise of the home place to the contestant, there is evidence on her part that the testator told her he was making the devise because it was Bud's wish, as she was his favorite sister.

The will involved in this appeal, dated September 1, 1943, was made and executed when the testator was approximately 83 years of age. This will bequeathed to the contestant the sum of five dollars, and there appears in the will an explanation as to why he bequeathed her only five dollars which is, in substance, as follows: That the contestant and her husband "shared in the 1943 wheat crop to the sum of $3,000.00." The daughter, Orpha Cross, was devised 160 acres, and also the 80 acres owned by the testator. The daughter, Jessie McArthur, was bequeathed $1,000; and certain bequests were made to grandchildren. The residue was placed in trust for the benefit of the testator's wife, and thereafter Jessie McArthur and Orpha Cross were to receive the benefit of the residue.

When the testator's son Bud died, the testator was left alone with his wife who was mentally incompetent to care and provide for herself. The contestant lived with her parents for over 22 years, and when Bud died,

she came and stayed a week with her parents. Other help was obtained for a while. In January 1943, the contestant, her husband and family, visited the testator and while there entered into an agreement whereby the contestant and her husband were to live with the testator and his wife and farm the land on the same basis as Bud had farmed it during his lifetime. The ground had been prepared and the crop planted when the contestant and her husband moved in with the testator in March 1943. The wheat was harvested and sold in the latter part of July, the contestant's share amounting to approximately $2,980. In the fore part of August 1943, the contestant and her family, in order to take advantage of a trucking situation whereby they could move their belongings to Cheyenne, Wyoming, where they lived, left the testator and his incompetent wife, explaining to the testator that the trucks were going to Cheyenne and they were going back home, and that "Orpha knows we are going, and I am sure she will get someone to stay with you."

The contestant and her husband testified that the agreement was that they were to return to their home in Cheyenne, and come back the next year and carry on the farming of the land. It appears that the testator, in making the agreement, desired to have someone stay with him and help take care of his incompetent wife, and this is borne out by the fact that he wrote to his daughter Jessie in Canada, remarking that the contestant did not care for him or his wife and left them, further that they had got over $3,000 from him, and he was through with them forever. On other occasions, the testator expressed his opinion that the contestant had all of his money she was going to get from him.

After the contestant and her family left, or about September 10, 1943, the testator and his wife moved in with a sister of the testator's wife. Shortly thereafter, and for about two years prior to his death, the

testator and his wife lived with his daughter, Orpha Cross, and her husband, and on occasions made contributions for the purchase of groceries. There was no particular arrangement made by the Crosses with the testator, with reference to the testator and his wife living with them.

The testator entered a hospital on June 25, 1945. The diagnosis made of his then condition was: A pathological heart, senile dementia, and emaciation. He died on July 29, 1945, and at the time of his death was insane.

Approximately 24 days after the testator made and executed the will in question, he endeavored to sell the land which he had devised in the will to his daughter Orpha Cross, to a son-in-law and another individual, and went to an attorney to have the papers made out with reference to the sale. He was admonished to think the matter over for a few days. However, immediately after seeing the attorney he said he knew all he wanted to know about the matter and was ready to consummate the sale of the land. Apparently he had not taken into consideration that his incompetent wife could not sign the instruments passing title. As a result, guardianship proceedings were started. The question arose as to whether or not the testator should be appointed guardian of his incompetent wife. The evidence was to the effect that he was not a proper person to be so appointed. The testimony of his daughter Orpha was to the effect that he was susceptible to influence, which extended to his business transactions.

With reference to the matter of guardianship, Orpha wrote a letter to the contestant, the substance of which is to the effect that she could handle her father, and for the contestant to talk the matter over with her and, if possible, be present at the hearing, and she recommended her husband as a proper person to be appointed guardian. She also informed the contestant that their father had considerable money. She was afraid other relatives would get it, and she desired that

their mother should not be deprived of her share. Other parts of the letter are not material.

It further appears from the evidence that the testator, prior to the death of his son Bud in August 1942, and more especially thereafter, was very eccentric and had formed many idiosyncrasies and peculiarities. The contestant testified to certain incidents: That during the time they lived with the testator, from March 1943 to the fore part of August, he would prowl around in the nighttime creating disturbances and knocking over furniture; that he, on many occasions, charged his grandchildren with stealing his watch and tools, which were later always found, and with destroying his property by putting sand in a motor, when in fact the rats running over the motor were the cause of the damage. He further charged the children had punched holes in the water tank, when in fact they had not. He had a dislike for turtle doves and wanted them shot. He always had firearms around the premises and on at least two occasions wanted to use them to dispose of two of his relatives who were creating trouble, as he viewed it. He scolded his wife on occasions, to endeavor to have her eat certain foods that she did not like. He quarreled with the contestant and on occasions wanted her and her husband to move, but retracted and wanted them to stay to help him. He was angered at the contestant's husband because he contemplated renting more land, and admonished him if he did he could leave the testator's premises. He was using water out of the stock tank when he could have used it out of the regular water barrel. He sold a tractor, received the money for it, was told about the denomination of the bills, and placed the money in a pocket. During the same night he believed that he had been defrauded and cheated, and told the contestant about it, saying that he was going to have the law on the purchaser. He left early the next morning and went to see the purchaser. He was angry with him, and finally took the money out of his pocket; it was counted and found to be the correct

amount. He then remarked that he was relieved.

After the death of his son Bud, and while certain parties were staying with him and his wife, the testator had a dog tied to the porch with insufficient slack in the chain to permit the dog to get off the porch, and when the dog would create a mess on the porch the testator kicked and scolded the dog. He oftentimes let the dog loose in the house to run around, but not outdoors. He listened to radio programs and made peculiar remarks with reference to the same; also a peculiar remark with reference to a clock striking.

It further appears from the evidence that during his lifetime, Bud purchased $500 worth of bonds. The testator felt that the contestant received two bonds when in fact it was Bud's intention for her to have but one, and that his daughter Jessie received no bonds from Bud, but he felt that Bud intended her to have a bond. It developed, however, that the contestant's brother's intention was that she should have two bonds. The testator was not convinced, and sent his daughter, Jessie McArthur, a check for $100 for a bond.

The testator was childish; talked about his immediate relations in their absence; did not want strangers on his premises; and had no use for people in general. He objected to the marriages of his different daughters, became unfriendly with them at the time, and did not make up until some time thereafter. He became forgetful and did not remember people whom he had known, although at one time he was well acquainted with them. He paid no attention to one of his granddaughters when she married a soldier and introduced him to the testator as her husband. He felt that his sister-in-law, where he and his wife stayed, was mean. He was described by the contestant as a dirty, mean, old man.

It is obvious that the contestant, in view of the evidence heretofore set out, contends that the testator, at the time he made and executed the will in question, was suffering with senile dementia, and that the disease had

so firmly clasped itself upon the testator's mind that he did not know the extent of his property, the purpose of his bequests and devises, or the natural objects of his bounty at the time he made and executed the will here involved; and, therefore, the district court erred in not submitting the issue of testamentary capacity to the jury.

"No right of a citizen is more valued, and more assured by law, than the power to dispose of his property by will. He is entitled to the control of his property while living, and by will to direct its use after his death, subject only to the restrictions which are imposed by statute. * * *

" 'It is one of the painful consequences of extreme old age that it ceases to excite interest, and is apt to be left solitary and neglected. The control which the law still gives to a man over the disposal of his property, is one of the most efficient means which he has in protracted life to command the attentions due to his infirmities.'

"A testator may dispose of his property as he pleases. The law does not require that he recognize his relatives therein, nor does it put any obstacle in the way of the aged or infirm in making disposition of their property by will; provided, only, that their mentality conforms to the accepted tests at the time of the execution of such testamentary instrument." In re Estate of Bose, *supra.* See, also, In re Estate of Goist, 146 Neb. 1, 18 N. W. 2d 513.

"In the contest of a will on the ground of incompetency, it does not necessarily follow as a matter of law from proof of temporary mental infirmities before and after the testamentary date that the jury should be permitted to pass on the state of testator's mind at that time, in absence of proof that there was then a mental disturbance." In re Estate of Laflin, 108 Neb. 298, 187 N. W. 885; In re Estate of Slattery, 125 Neb. 194, 249 N. W. 597.

"Gross eccentricity, slovenliness in dress, peculiarities of speech and manner, or ill health are not facts

sufficient to disqualify a person from making a will."
In re Estate of Frazier, *supra.*

. The foregoing authorities are applicable to the facts in the instant case.

The contestant presented the testimony of an expert who defined the disease of senile dementia, its effect, and the manner in which it applied to the testator. He testified that the disease is progressive, cannot be remedied, and grows worse as time progresses; that when it is determined that the disease is present in a person at a certain time, that the expert is placed in a position, due to the fact that the disease cannot be remedied and the quality of the mind is in constant deterioration, to determine at all time intervening the quality of the mind from and after the date the disease is established as being present in the person. He never had the opportunity to examine the testator, or observe him.

"The opinion of a medical expert must be predicated on one or more of the following: Examination and observation of the person who is the subject of the inquiry, examination and history, or supposed facts of which there is evidence." In re Estate of Witte, *supra.*

"An expert witness will be permitted to give his opinion as to mental capacity if it is predicated on a proper and sufficient foundation." In re Estate of Witte, *supra.*

In the instant case the hypothetical question upon which the expert based his opinion discloses many eccentricities, idiosyncrasies, and peculiarities that properly reflect the record.

The expert, after proper foundation was laid for the admissibility of his testimony, gave his opinion that a year or more prior to September 1, 1943, the testator was afflicted with the disease of senile dementia, his final diagnosis being that he had the disease in 1942, or earlier. He testified with reference to two letters as constituting a false belief the testator had that influenced his behavior, and that the testator, on September 1, 1943, the day the will in question was made and executed,

and on November 2, 1944, the day the codicil thereto was made and executed, did not understand the extent and nature of his property or its value. "I believe that such a man could know what he was doing in a superficial way. He knew he was, perhaps, changing his will. I do not believe, by the nature of his disease, that he had any appreciation of this long term of significance."

The effect of the expert's direct testimony is that at the date of the execution of the will and the codicil thereto in question, the testator did not possess sufficient testamentary capacity to execute the instruments, and was incompetent to do so. On cross-examination the expert testified he was confined to the hypothetical question in the questions asked him. He testified that if the letters in evidence disclosed they were with foundation, his opinion would be different. He was asked, in substance, if after the execution of the will the testator corresponded with one of the heirs and he had shown in that correspondence knowledge of what he had done with reference to his property in connection with that heir, would that not be an indication that he knew the long-term effect of his will, and would it not be an indication of mental soundness? His answer was that it would be an indication. He was asked whether or not a person with senile dementia could pull himself together, so to speak, and transact business as a normal man. His answer: "Yes. At times, he may cover up to that extent." He was asked, in substance, if it was shown the testator lived with a family the last year of his life, in their home, and was friendly with them, would that be a factor which might incline him away from his opinion that he was suffering from senile dementia? The answer was "Yes." He was further asked if the same people were the principal beneficiaries under his will, and in the absence of undue influence, would that be a factor which might make him determine that he did not have senile dementia? His answer was "Yes."

It is apparent that matters brought out on cross-

examination would have a tendency to induce this expert to modify his opinion with reference to the competency of the testator at the time the will was made and executed, and also the time the codicil thereto was made and executed.

The rule with reference to nonexpert witnesses is as follows: "A nonexpert witness who is shown to have had a more or less intimate acquaintance with a person may be permitted to state his opinion as to the mental condition of that person, if said condition becomes a material subject of inquiry, by giving the facts and circumstances upon which the opinion is based." In re Estate of Witte, *supra*.

In the instant case, a son-in-law of the testator purchased an automobile from him in August of 1943, within a month of the time the will was executed and after the contestant and her family left for Cheyenne. He testified that at that time he thought the testator was competent, to the best of his knowledge. When this same witness contracted to purchase land from the testator, he testified relative to the testator's competency: "I wouldn't say too competent. In other words, he wasn't too bad and wasn't too good."

When the contestant and her family leased the testator's land and received their interest and share for the wheat crop, and then moved out leaving him alone with his incompetent wife without any previous notice that they were moving, they dealt with the testator as a competent person. The contestant never expressed any opinion with reference to her father's competency or incompetency at the time he executed the will in question and codicil thereto. She, in fact, said she had not formed an opinion, but guessed it would be "No."

A witness who resided with the testator subsequent to the death of his son Bud and prior to the time the contestant and her family came to live with the testator, testified that he thought that the testator did not understand what was said over the radio. His evidence does

disclose that the testator was competent to transact business at the time.

There are several letters in evidence, written by the testator to his daughter, Jessie McArthur, from August 4, 1943, to May 15, 1945, which indicate that he knew the members of his family, about whom he gave news in general and made reference to their trials and tribulations. He also gave news about neighbors, and expressed his opinion on certain events and with reference to family matters, indicating that during this period of time he possessed the same competence as an ordinary individual.

After the contestant and her family left, the testator had a farm sale. There is nothing to show that he did not know about his property. He collected his share of the federal AAA money in the late fall of 1943. The witness testifying to this fact testified that the testator was competent to transact business at that time.

As stated in In re Estate of Bose, *supra*: " 'Senile dementia, often a result from old age, does not necessarily result in mental incapacity to make a will, but there must be such a failure of mind as will deprive the testator of intelligent action. The disease is progressive in nature, and it must be determined whether its progress has so impaired the faculties of the testator that they fall below the mark of legal capacity. This must be determined not alone by the nature and tendency of the disease, but by its effect in the particular case.'

"On the other hand, the authorities generally sustain this conclusion, viz.: 'A person possessing the requisites of testamentary capacity is not incapacitated from making a will by old age, although his advanced years be accompanied by infirmity of mind and body. Nor is he incapacitated by failing memory, vacillating judgment, childishness, slovenliness in dress, eccentricities or peculiarities in habit or speech, and even delusions or hallucinations if they do not affect the execution of the

will, and he is not limited to conventional methods of disposition.' 68 C. J. 440.

"We appear committed to the view that, when the testamentary capacity of a testator is challenged on grounds of alleged senile dementia, this fact shall be determined according to the rules applicable to other forms of insanity. In re Estate of Winch, 84 Neb. 251, 121 N. W. 116. See, also, Stull v. Stull, 1 Neb. (Unof.) 389, 96 N. W. 196. The accepted view is, viz.: 'The mental capacity of a testator is tested by the state of his mind at the time he executed his will.' In re Estate of Laflin, 108 Neb. 298, 187 N. W. 885."

In the instant case, the application of this test to the testator's condition as it existed on the 1st day of September, 1943, when he made his will, and on the 2d day of November, 1944, when he executed the codicil thereto, is decided by ascertaining whether William A. Scoville then and there understood the nature of the act, the extent of his property, the proposed disposition of it, and the natural objects of his bounty. The result of that test necessarily determines the validity of these testamentary instruments in suit, so far as concerns questions of mental capacity. See In re Estate of Kajewski, 134 Neb. 485, 279 N. W. 185; In re Estate of Frazier, *supra;* In re Estate of Ayer, 114 Neb. 849, 211 N. W. 205; In re Estate of Nelson, 75 Neb. 298, 106 N. W. 326; In re Estate of Goist, *supra;* In re Estate of Witte, *supra;* In re Estate of Johnsen, *supra;* In re Estate of Inda, *supra.*

"It is said that less mental faculty is required to execute a will than to enter into any other legal instrument; that the testator's property was his own, he had the power to do with it as he chose, and while he may have had delusions, that does not of itself constitute incapacity, for a delusion affects testamentary capacity only when it enters into and controls its exercise." In re Estate of Frazier, *supra.*

The testator had a right, in making his will, to elim-

inate the contestant therefrom to the extent which he did. He gave his reason for so doing. Apparently he believed that when he leased the land to the contestant and her husband they would remain with, and live with, him and help to take care of his incompetent wife. This seems to be the very basis for making the agreement with the contestant and her husband. When he made and executed the will he gave directions to the attorney with reference to the paragraphs he desired to have retained in the will and those he wanted deleted. Later, when the trustee named in the will died, the testator retained knowledge of the will to the extent that he went alone to suggest another executor and trustee and, as a consequence, the codicil to the will was made.

"In order that a will may be rejected on the ground of incompetency of the testator the evidence of the objector must be sufficient to sustain a reasonable inference that the testator was incompetent to make a will.

"It is the duty of trial courts to determine the issues upon which there is competent evidence and submit them, and them only, to the jury. In a will contest on the ground of mental incompetency and undue influence, if the evidence is insufficient to sustain a verdict upon either of such issues in favor of the contestants, then the trial court should withdraw both issues from the jury and direct a verdict." In re Estate of Inda, *supra.*

" 'To justify the direction of a verdict, it is not necessary that there should be literally no evidence to go to the jury; it being sufficient that there is none that ought reasonably to satisfy the jury that the fact sought to be proved is established.' " In re Estate of Frazier, *supra.*

We conclude, in the light of the foregoing authorities and the evidence adduced in this will contest, that the trial court did not err in not submitting the issue of testamentary capacity to the jury.

The next question to determine is whether or not the trial court erred in not submitting to the jury the issue of undue influence alleged to have been practiced by

Orpha Cross, the testator's daughter, and her husband on the testator.

"The elements necessary to be established to warrant the rejection of a will on the ground of undue influence are: (1) That the testator was subject to such influence; (2) that the opportunity to exercise it existed; (3) that there was a disposition to exercise it; and (4) that the result appears to be the effect of such influence." In re Estate of Goist, *supra;* In re Estate of Inda, *supra*.

On the issue of undue influence, the record discloses that John R. Cross, the husband of Orpha Cross, had been acquainted with the testator since 1910, and more especially since 1917 when he married Orpha, and had visited the Scoville home at least once a month when the Crosses lived in the same county. After Bud's death they visited the Scoville home three or four times a week when nobody was staying with the Scovilles, and thereafter about twice a month if the Scovilles had help. There is no competent evidence to show that John R. Cross participated in any of the business of the testator, inquired about his property, or suggested how he should leave it. He was told by the testator, after the contestant and her family left, that his wife was to receive a quarter section of land. He was asked by the testator if he thought that Mr. Jessup would be a proper person to replace Mr. Snyder who had died, and who had been named executor and trustee in the will. Mr. Jessup was so named in the codicil. On the occasions of the Crosses visiting the Scovilles prior to Bud's death and subsequent thereto, they would take cream, milk, cakes, and other items on numerous occasions. It further appears from the record that John Cross manifested some interest in the guardianship matter and talked to an attorney about it when the testator had contracted to sell his land to a son-in-law and another person. He rented all of the testator's land after the contestant and her family had left, and gave the testator half of the crop the first year because it was summer tilled, and he per-

sonally paid the expenses and combined the wheat and drilled the land. Thereafter he paid the customary rent of one-third. He testified he first learned that his wife was devised the land of the testator the day after his death. He had never been told by the testator that he, the testator, had devised the land to his wife.

The daughter, Orpha Cross, testified that she had no conversation with her father with reference to a will or how he should dispose of his property at his death, or went with him to consult an attorney with reference to a will or change to be made in a will; that there was no arrangement for her father and mother to live with the Crosses; that they came one Sunday for dinner and asked if they might stay all night and the next morning the testator asked if they could stay, and they were permitted to stay; and that at times her father contributed approximately $10 per week to assist in payment of the groceries. She admitted testifying at the guardianship matter that her father was susceptible to influence, and easily influenced, and that this extended to his business transactions.

There is a letter written by this witness to the contestant with reference to the guardianship matter which is heretofore referred to in the opinion. It is apparent from this letter that she believed her parents should keep their property and that the income from it would be sufficient to provide for them or, in any event, she did not want to permit her father to dispose of the property to the detriment of her mother's interest.

This constitutes briefly the relevant and material evidence on the issue of undue influence upon which the court concluded such issue should not be submitted to the jury. It seems apparent from the evidence adduced on this issue that it is insufficient to make a prima facie case of the elements necessary to establish undue influence, and fails to show any undue influence exercised by either Orpha Cross or John R. Cross upon

William A. Scoville in connection with the execution of either the will or the codicil thereto.

We conclude the trial court was not in error in not submitting the issue of undue influence to the jury.

For the reasons given in this opinion, the judgment of the district court is affirmed.

AFFIRMED.

KROGER, District Judge, dissents.