IN RE ESTATE OF OMAR A. KAISER, DECEASED.

M. B. McDOWELL, APPELLEE, v. NETTIE A. PARKER ET AL., APPELLANTS.

34 N. W. 2d 366

Filed October 28, 1948. No. 32467.

*Porter & Porter,* for appellants.

*Charles A. Fisher,* for appellee.

Heard before SIMMONS, C. J., PAINE, CARTER, MESS-MORE, YEAGER, CHAPPELL, and WENKE, JJ.

CHAPPELL, J.

Brothers and sisters of Omar A. Kaiser, deceased, contested the probate of his will and codicil thereto, upon the grounds that the instruments were not signed by the testator or attested and subscribed as required by law; that they were obtained by undue influence; and that the testator lacked testamentary capacity. Proponent prevailed in the county court and contestants appealed to the district court, where, upon trial to a jury, proponent was awarded a verdict and judgment. Motion for new trial was overruled, and contestants appealed to this court, assigning as error substantially that the trial court erred in refusing to direct a verdict for contestants at the conclusion of proponent's evidence in chief; in giving instructions Nos. 7, 8, 12, and 15 respectively, and refusing to give contestants' proferred instructions Nos. 1 and 2; in permitting proponent, over objection of contestants, to respectively identify the beneficiaries under the will and permit the jury to observe them in open court; and, that the verdict and judgment were contrary to law and not sustained by the

evidence. We find that the assignments should not be sustained.

At the outset it should be stated that the issue of undue influence was not supported by any competent evidence, and concededly is not involved in this appeal. Our conclusions with reference to the other issues are dependent upon the evidence adduced and well-established rules of law applicable thereto.

Without dispute, Omar A. Kaiser, testator, 70 years of age, whose death occurred September 10, 1946, was during his lifetime a bachelor farmer and rancher. He had accumulated a substantial estate, consisting of lands, securities, and cash. On June 12, 1945, he suffered a cerebral hemorrhage, and, upon his physician's orders, was removed to the Chadron Municipal Hospital, where he remained until his death.

Proponent's evidence in chief consisted of the testimony of testator's attending physician, his attorney, the other witnesses who attested and subscribed his will and codicil, and two friends of testator who not only visited with him in the hospital near the time of the execution of the instruments involved, but also thereafter.

The testimony of those witnesses, together with the instruments themselves, buttressed with other evidence adduced by proponent subsequent to the introduction of contestants' evidence contra thereto upon the issue of testamentary capacity, may be briefly summarized as follows: As a result of the hemorrhage, testator suffered a paralysis of his left side. He also had an old genitourinary trouble which became aggravated and painful a short time after he entered the hospital, but favorably responded to treatment, and never affected his testamentary capacity. The paralysis affected his speech, which was impaired for approximately two weeks after he entered the hospital. Thereafter, his speech and general physical condition improved, and at all times involved, without relapse mentally, testator was normal

mentally and possessed the testamentary capacity essential to the making of a valid will and codicil, as hereinafter defined.

After testator had been in the hospital a few days, his attorney, who had represented him for 30 or 40 years, and had personally known him for 50 years or more, visited him. After the attorney's first visit, he returned upon other occasions at the request of testator. During such visits, testator consulted with the attorney about several business matters involving his property, and at the request of testator, the attorney looked after such matters for him.

On July 13, 1945, testator inquired about and asked the attorney to draw a will for him, and requested that he come back soon. On the following day, the attorney returned. At that time they talked about the testator's brothers and sisters and where they lived, as well as his property, and the disposition thereof, whereat the testator said: "Well, * * * this property is to go to two little boys. * * * they are the sons of Mike Kaiser. * * * I understand they are in San Diego, California." Thereafter, the attorney wrote out the will in longhand in the presence of the testator, and read it to him.

The will consisted of two sheets numbered (1) and (2) respectively. The dispositive portion of the will thus written, and signed by the testator, all appeared on page (1). The perfected attestation clause thereof, subscribed by the witnesses, alone appeared on page (2). Both the will and the attestation clause recited respectively that the testator's last will and testament was "on two pages (1 & 2)" and that it was an "instrument of two pages." Whether or not the two sheets were physically attached to each other at the time of execution does not affirmatively appear in the evidence. There is competent evidence, however, that page (1) was the paper signed by the testator as his last will and testament in the presence of the attesting and subscribing witnesses, who signed the attestation clause on page (2) in his

presence and in the presence of each other, and that after the execution of the will both pages were placed in a sealed envelope and on the same day delivered into the custody of the county judge, who thereafter opened it only after testator's death. The dispositive portion of the will provided: "I hereby give, devise and bequeath to James Kaiser and Elwin Kaiser, sons of James Kaiser all of San Diego, California, share and share alike, all of my estate of both real and personalty wherever situate."

The codicil thereto, executed July 18, 1945, was all on one page, with a perfected attestation clause thereon, which codicil was likewise placed in a separate sealed envelope and delivered into the custody of the county judge on the day following its execution, who thereafter opened it only after testator's death.

After the will was written by the attorney, he told testator that a couple of witnesses were needed; and testator replied "Well, you will have to get them, I am depending on you." Thereupon, the attorney procured a clerk at the hospital to act as a witness and testator asked her if she was "going to watch him to sign his name to that piece of paper," identified by her and the attorney as page. (1) of the will, a part of proponent's exhibit 1, as offered and received in evidence.

Testator was then raised up in bed and a candy box or book was procured, upon which to place the will for signature. He was given a pen, and in the presence of the attorney and the other witness, wrote "Omar A" and started to write "Kaiser" when his hand trembled and "he looked up at his attorney" and asked him "to help him finish." Thereupon, the attorney assisted him in finishing the word "Kaiser" by guiding testator's hand. Thereafter, both the attorney and the other witness signed the attestation clause on page (2) of the will, in the presence of the testator and each other.

Soon after execution of the will, the attorney learned that the beneficiaries under the will then actually lived in

Chadron with their mother, although for a while they had lived in California, and that their names, as well as the descriptive identifying name of their father, were not in all respects complete and correct as written in the will. It appears that their father, although sometimes known as "Mike," was actually named "Fred Elwyn Kaiser." Thereafter, the attorney consulted with testator about the matter, telling him that he, the attorney, "must have misunderstood him," and advised testator that a codicil would be proper procedure to remedy the inadvertent mistake, whereupon testator replied: "Whatever you say; that's all right. I want it down right."

In conformity therewith, such a codicil was prepared by the attorney and read to the testator, who said: "Well, that's all right; just right." At that time, on July 18, 1945, the codicil was executed for that purpose, correctly describing the beneficiaries under the will as to full names and identifying fatherhood, residence, and age. It then recited: "I do give, devise and bequeath unto Robert Eugene Kaiser and James Norris Kaiser, sons of Fred Elwin Kaiser, share and share alike, all of my property of every nature soever, real, personal and mixed and wherever situate and to their heirs and assigns forever.

"Otherwise than herein stated, this is to positively affirm, corroborate and establish my last will and testament as heretofore stated and in my said last will and testament stated of July 14th, 1945."

The codicil, offered and received in evidence as exhibit 4, was executed under circumstances comparable with those under which the will was executed, except that testator also asked another person to sign as a witness for him. At that time, in the presence of three attesting witnesses, testator wrote "O." and "A.", when his hand trembled again, and he asked the attorney "if he would help him, kind of guide his hand," and the attorney took hold of his hand and assisted him in writing the name "Kaiser." The three witnesses then signed the attestation

clause as witnesses in the presence of testator and each other, after which testator said: "I am very glad that this was done, I am glad. I am glad it is on the road, and I believe that I will be around in a little while again, and when I can get around I will pay you."

After execution of the will and codicil, testator lived for approximately 14 months, and at subsequent times, when he was concededly competent in every respect, stated that he had enough money to pay his hospital and doctor bills and that he had made a will, leaving his property to Mike's little boys and appointing his physician as administrator. There is evidence that testator in his lifetime often visited and cared for the boys in their home, lived there with them for some time after their father had left their home, and that they visited him at the hospital upon several occasions at his request, where they played, talked, and joked with testator.

In disposing of contestants' assignments of error, we turn then to applicable rules of law, bearing in mind that: "It is elementary that a defeated litigant in a will contest case is not entitled to a trial de novo on appeal to this court. Issues of fact in such cases are determined in the Supreme Court by the sufficiency of the evidence under the law to sustain the verdict of the jury or the findings of the district court, and where the evidence in a case tried to the jury is conflicting, issues of fact are questions for its determination." In re Estate of Woodward, 147 Neb. 270, 23 N. W. 2d 75. See, also, In re Estate of Renter, 148 Neb. 776, 29 N. W. 2d 466; In re Estate of Kerr, 117 Neb. 630, 222 N. W. 63.

This court has consistently held that the burden is upon proponent of a will, both in the county court and in the district court on appeal, to prove by a preponderance of the evidence not only the lawful execution of the will, but also the testamentary capacity of the testator at the time when the will was made. However, if the proponent makes a prima facie case in chief as to both, then it devolves upon a contestant to proceed and

adduce sufficient competent evidence to overcome the presumption arising therefrom, after which the burden of going ahead and proving those issues by a preponderance of the evidence devolves upon proponent. In re Estate of Keup, 145 Neb. 729, 18 N. W. 2d 63; In re Estate of Witte, 145 Neb. 295, 16 N. W. 2d 203; In re Estate of Inda, 146 Neb. 179, 19 N. W. 2d 37; In re Estate of Scoville, 149 Neb. 415, 31 N. W. 2d 284; In re Estate of Renter, *supra*; In re Estate of Woodward, *supra*.

Section 30-204, R. S. 1943, provides: "(1) No will made within this state, except such nuncupative wills as are mentioned in section 30-205 shall be effectual to pass any estate, whether real or personal, nor to change, or in any way affect the same, unless it be in writing, and signed by the testator, or by some person in his presence, and by his express direction, and attested and subscribed in the presence of the testator by two or more competent witnesses; * * *."

The statutory provisions controlling the manner in which wills must be executed are generally held to be mandatory and subject to strict construction, and if not substantially complied with, the will is inoperative. In re Estate of Cagle, 132 Neb. 47, 270 N. W. 664; In re Estate of Smith, 130 Neb. 739, 266 N. W. 611.

In the latter cited case, it was held that: "The attestation required of witnesses to a will consists in their seeing that those things exist and are done which the statute requires to exist or to be done in order to make the instrument, in law, the will of the testator. 68 C. J. 673."

In Holyoke v. Sipp, 77 Neb. 394, 109 N. W. 506, it was held: "A presumption of the due execution of a will arises from the presence of an attestation clause which recites the facts necessary to the validity of the will, and, in the absence of evidence discrediting the statements, the will should be admitted to probate." The opinion cited and quoted with approval 1 Underhill, Law of Wills, § 201, p. 276, to the effect that: " 'So, when the

subscribing witnesses are present at the probate and admit the genuineness of their signatures, but deny or are unable to recollect some or all of the facts which were attendant upon the execution, so that one or both of them are unable or unwilling to testify with positiveness and of their own knowledge that all the requirements of the statute were complied with, a presumption of due and proper execution will arise from the recitals of a perfect attestation clause, which becomes conclusive in the absence of satisfactory proof to the contrary.' " See, also, Dame, Probate and Administration, (3d ed.), § 141, p. 151.

With regard to the signature of the testator, a distinction must be borne in mind, which contestants have failed to do, between those cases where the act of signature was in fact and in law the act of the testator himself, and those where the act of signature was in fact by another in the testator's presence and by his previous express direction. In the latter situation, we have held: "When in a contested proceeding for the probate of a will, it is disclosed that the name of the alleged testator was affixed to the instrument in controversy by some person *other than himself,* it is incumbent upon the proponent to establish by unequivocal evidence that the deceased gave direction to such person for writing his name, consciously and explicitly, and in the free and voluntary exercise of his faculties." (Italics ours) McCoy v. Conrad, 64 Neb. 150, 89 N. W. 665. See, also, Murry v. Hennessey, 48 Neb. 608, 67 N. W. 470; Elliott v. Elliott, 3 Neb. (Unoff.) 832, 92 N. W. 1006; and Isaac v. Halderman, 76 Neb. 823, 107 N. W. 1016.

On the other hand, in Thompson v. Thompson, 49 Neb. 157, 68 N. W. 372, this court approved the general applicable rule appearing in Schouler, Wills, (2d ed.), § 303, which is that: " 'Wherever, in truth, the act is the testator's own act, *animo testandi,* though with the assistance of another, it is not necessary to prove any express request for assistance on his part. And under

any circumstances, a testator signs his will where he makes the physical effort and performs the act, even though his hand be steadied or guided by another, if something is produced upon the paper sufficient to identify his signature, and his own purpose to sign accompanied the action, while he was assisted and not controlled.'" See, also, 68 C. J., Wills, § 291, p. 659. In re Estate of Lodge, 123 Neb. 531, 243 N. W. 781, is not in any manner inconsistent or in conflict with such general rule, but the opinion therein simply based its conclusions affirming validity of the will upon the facts of that particular case.

Since Hawke v. Euyart, 30 Neb. 149, 46 N. W. 422, 27 Am. S. R. 391, it has been the rule that: "A Codicil ratifying and confirming a will, in whole or in part, will amount to a republication of the will, bringing down its words and causing it to speak as of the date of the codicil." It is also generally held that a codicil signed and attested in strict compliance with the statute, which in express terms confirms a will, is a republication and reacknowledgment of such will, and remedies all the defects in its execution. Dame, Probate and Administration, (3d ed.), § 69, p. 61; Woerner, The American Law of Administration, (3d ed.), § 47, p. 122, § 56, p. 163.

There is no statutory provision in this state designating just where a will shall be attested and subscribed by the witnesses, or forbidding the use of separate sheets in making a will, or directing how or that they shall be physically attached to each other in order to make a valid will. As a matter of fact, a will may be probated without any attestation clause whatever, provided the subscribing witnesses testify that it was duly executed according to law. Williams v. Miles, 68 Neb. 463, 94 N. W. 705, 110 Am. S. R. 431, 62 L. R. A. 383; Monroe v. Huddart, 79 Neb. 569, 113 N. W. 149, 14 L. R. A. N. S. 259; Spier v. Spier, 99 Neb. 853, 157 N. W. 1014, L. R. A. 1916E 692; Dame, Probate and Administration, (3d ed.), § 141, p. 151.

Contrary to contestants' contentions, and as stated in 68 C. J., Wills, § 267, p. 639: "A will need not be written entirely on one sheet of paper, but may be written on several sheets, provided the sheets are so connected together that they may be identified as parts of the same will. While connection by the meaning and coherence of the subject matter is sufficient, as physical connection by mechanical, chemical, or other means is not required, although it is sufficient when made, in the absence of such physicial connection, the papers must be identified as one will by their internal sense. Where there is sufficient credible proof of the identity of disconnected sheets propounded as one will, neither the physical nor coherent rule of attachment is applicable." See, also, 57 Am. Jur., Wills, § 224, p. 188, § 225, p. 189, and § 226, p. 189; Annotation, 30 A. L. R. 424. In the case at bar, the sheets were not only connected by their internal sense, but identified by the subscribing witnesses as connected parts of testator's will.

This court has consistently adhered to the rule that a testator who is competent may dispose of his property as he pleases, and he is not required to recognize relatives in his will. In re Estate of Bose, 136 Neb. 156, 285 N. W. 319; In re Estate of Thomason, 144 Neb. 300, 13 N. W. 2d 141; In re Estate of Goist, 146 Neb. 1, 18 N. W. 2d 513; In re Estate of Scoville, *supra.*

Testamentary capacity is tested by the state of the testator's mind at the time of execution of the will, and he is mentally competent to make a will if he knows the extent and character of his property, the proposed disposition of it, and the natural objects of his bounty. In re Estate of Woodward, *supra;* In re Estate of Goist, *supra;* In re Estate of Scoville, *supra.*

In the light of the foregoing evidence and cited authorities, we conclude that the trial court correctly overruled contestants' motion for directed verdict, made at the conclusion of proponent's case in chief; that the issues presented by the evidence were properly for determina-

tion by a jury, under appropriate instructions; and that the verdict and judgment were amply sustained by the evidence.

Also, in the light of the evidence and the authorities heretofore cited, we have examined instructions Nos. 7, 8, 12, and 15, given by the trial court, and without further discussion conclude that they correctly stated the law and were not prejudicially erroneous, as argued by contestants. We conclude, also, that instruction No. 1, requested by contestants, which related to the act óf signing but did not reflect the applicable rule, was properly refused, and that the refusal of contestants' requested instruction No. 2 could not be prejudicially erroneous because it was in fact given almost verbatim in instruction No. 13.

There remains for discussion then only the question of whether or not the court erred in permitting proponent, over objection of contestants, to respectively identify the beneficiaries under the will and permit the jury to observe them in open court. In that connection, during the trial the mother of the beneficiaries under the will testified that she had been previously married to Fred Elwyn Kaiser, father of the beneficiaries, whereupon she was asked, and answered without objection: "Q They are the two little boys sitting over here? A That's right. Q How old are they now? A Now? They are nine and ten." Thereafter, counsel for proponent said: "Q That is all. Will you call the children forward so the jury may see them, and tell the jury which is which?" Counsel for contestants then said: "We object to this as incompetent and immaterial and improper conduct. I am glad to have the jury see them, but I think I should preserve the right ____." The purported objection was overruled, whereupon the witness answered: "This is Robert Eugene and this is James Morris (indicating.)" Q "How old are they?" A "This is ten and this is nine."

Contestants cite no authority in point which could sustain their contention that the foregoing was prejudi-

cially erroneous. To the first part of the evidence, no objection was made. To the latter, identical in all material respects, there was consent rather than objection. In other words, contestants objected to the introduction of the evidence for the purpose of making and preserving the record upon appeal, but at the same time consented to its introduction, doubtless to avoid an unfavorable impression upon the minds of the jury. Under the circumstances, contestants waived whatever objection they may have had thereto.

In that connection it was held in Hickman v. Layne, 47 Neb. 177, 66 N. W. 298: "Error cannot be predicated on the admission of certain testimony, where ample testimony of the same nature was admitted without objection." As stated in 64 C. J., Trial, § 189, p. 167: "A party may, by his acts or omissions, waive, or be estopped to make, objections to the admission or exclusion of evidence. Such waiver or estoppel may arise from failure to object, from acts done or omitted before the evidence is offered, as by failure to object to previous similar evidence, or from some affirmative act done after the ruling on the evidence." Also, as stated in 53 Am. Jur., Trial, § 143, p. 127: "If when inadmissible evidence is offered the party against whom such evidence is offered consents to its introduction, or fails to object, or to insist upon a ruling on an objection to the introduction of such evidence, and otherwise fails to raise the question as to its admissibility, he is considered to have waived whatever objection he may have had thereto, and the evidence is in the record for consideration the same as other evidence."

For the reasons heretofore stated, the judgment of the trial court should be and hereby is affirmed.

AFFIRMED.