IN RE ESTATE OF MARY WAHL, DECEASED. WILLIAM UHLIG, EXECUTOR OF THE ESTATE OF MARY WAHL, DECEASED, APPELLANT, v. GUY WAHL, APPELLEE.

39 N. W. 2d 783

Filed November 23, 1949. No. 32622.

*John H. Wiltse* and *F. A. Hebenstreit,* for appellant.

*Jean B. Cain* and *Paul P. Chaney,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is a will contest in which an instrument purported to be the last will and testament of Mary Wahl, deceased, and a codicil thereto, are involved. The will and codicil were admitted to probate in the county court over objections of the contestant, the son and only heir at law of Mary Wahl. From the decree of probate, contestant appealed to the district court.

To the petition for probate of the will and codicil in the district court, the contestant filed objections in part

as follows: That at the time the will and codicil thereto were made and executed, the testatrix was mentally incompetent to make and execute such instruments for the reason that when the same were made and executed her mind was impaired to the extent that she was incompetent of understanding, realizing, or appreciating what disposition she had made of her property therein, and did not understand or comprehend the meaning or effect of the disposition of her property; that by reason of her mental condition at that time she falsely imagined that contestant was antagonistic and unfriendly to her, and, as a result, she formed a prejudice against him based entirely upon false premises and without reason; and that said instruments were the direct result of such insane delusions, and would not have been made had she been of sound mind.

At the close of contestant's case and at the close of all of the evidence, the proponent moved for a directed verdict, which was overruled. The jury returned a verdict finding that the will offered for probate was not the last will and testament of Mary Wahl, deceased, and the codicil was not a codicil thereto. Upon the overruling of the motion for new trial and judgment notwithstanding the verdict, the proponent appeals.

The proponent assigns as error the trial court's submission to the jury of testamentary capacity. The first question to determine is the sufficiency of the evidence to warrant submission of the case to the jury on the issue of testamentary capacity.

The mental capacity of a testator is tested by the state of his mind at the time he executed his will. If the testator knows the extent and character of his property, the natural objects of his bounty, and the purposes of his devises and bequests, he is mentally competent to make a will. See, In re Estate of Laflin, 108 Neb. 298, 187 N. W. 885; In re Estate of Scoville, 149 Neb. 415, 31 N. W. 2d 284; In re Estate of Kaiser, 150

Neb. 295, 34 N. W. 2d 366; In re Estate of Hunter, *ante* p. 704, 39 N. W. 2d 418.

In the instant case the proponent made a prima facie case in substance as follows: The attorney who drafted the will and codicil in question had known the testatrix for a number of years. He transacted business first with her in 1939. At the time the will was drafted, August 16, 1940, the testatrix, without benefit of memorandum, designated her property, its location in the house, her real estate, and the disposition to be made of the property. On October 25, 1940, when the codicil was made and executed, she knew the changes she desired to make in her will. On the dates of the making and execution of the instruments she was mentally competent to make the same. Other witnesses who had an acquaintance with her and witnessed the instruments testified to her mental competency to make the same upon the dates upon which they were made.

If the proponent makes a prima facie case as to testamentary capacity, it then devolves upon the contestant to overcome the presumption arising therefrom, after which the burden of going ahead and proving testamentary capacity by a preponderance of the evidence devolves upon the proponent. See, In re Estate of Woodward, 147 Neb. 270, 23 N. W. 2d 75; In re Estate of Hunter, *supra*.

A defeated litigant in a will contest is not entitled to a trial de novo on appeal from the judgment of the trial court. An issue of fact in such a contest is determined in this court by the sufficiency of the evidence to sustain the verdict of the jury, and in testing the sufficiency thereof to support the verdict it will be considered in the light most favorable to the successful party, any controverted fact will be resolved in his favor, and he will be given the advantage of any inferences that can reasonably be deduced therefrom. See, In re Estate of Kerr, 117 Neb. 630, 222 N. W. 63; In re Estate of Hunter, *supra*.

The record discloses that from and after the death of her husband on January 4, 1940, her son having moved to California in January 1920, the testatrix lived alone in Falls City, Nebraska, where she had been a resident for more than 60 years prior to her death March 24, 1948, at which time she was approximately 81 years of age. Her death occurred in the Lincoln State Hospital. The will in question contained bequests to certain friends and acquaintances of personal property located in her home. She devised her home and certain personal property situated therein to a nurse employed by her physician. She bequeathed to her son one dollar, for reasons personal to herself and which she stated need not be set forth or explained in the will. The residue of her estate was given, under certain conditions, to be used by officials of her church. The codicil changed the bequest to the son to the amount of $200, for reasons personal to herself which were not explained in the will, and a change was made with reference to the residue of the estate to the church.

The contestant's evidence disclosed that Guy Wahl, testatrix's son, lived with his parents except when he was on construction work. His mother never approved of the girls with whom he kept company. After he was married in Atchison, Kansas, he brought his wife home to visit his parents. His mother would not speak to his wife. This marriage resulted in a separation. The son left his parent's home in 1920, moving to California, as he stated, to live his own life and go with whom he pleased. He was married the second time in California to a former resident of Falls City of whom his mother did not approve. In 1923, the mother visited the son in California. She did not approve of nor speak to his wife any more than she could help. She stayed about six weeks, and then returned home. In December of 1925, at the son's request, his parents visited him. He proposed to make a home for them if they liked the country, and to eventually build a home for them on a commercial

acreage which he owned. However, after spending the winter, his parents returned home. In October of 1926, the mother went to California and stayed with friends. The son testified he visited his mother at her friend's home while she was in California on this visit. This was the last time he saw his mother. One of the purposes of her visit was to collect the sum of $200 which the son owed her and was evidenced by a note which he paid when due. She claimed that he closed the door in her face and would not let her into the house.

After the return of the mother to her home, the son wrote jointly to his parents and received no response from his mother. He wrote to his father up until the time his father became ill. Upon the death of his father he received a telegram from neighbors and friends informing him of the death. He was unable to attend the funeral due to lack of time. After his father's funeral he wrote to his mother and received no response from her. He made an effort to ascertain the condition of her health, and was advised of her condition by others.

On July 25, 1942, Mary Wahl was committed to the Lincoln State Hospital. At that time she was approximately 75 years of age. The doctor's report reflects that she was suffering from delusions of persecution, was highly nervous and erratic, and that her mental condition had become progressively worse in the last 20 years.

Before her commitment to the state hospital she would complain that her telephone rang constantly when in truth and in fact, based upon her complaints, the telephone number had been plugged, which would require removal of the plug to call her.

A neighbor who lived next door to Mary Wahl in June 1942, testified that she would come to her home in the nighttime, stand at the foot of her bed, frighten her and the children, and then run; that she put rat poison on slices of potato to poison this witness's chickens, and sprinkled blackberry bushes with powder, causing the berries to be removed for fear that strangers might get

ahold of them; that Mary Wahl would come "around" on the front walk at night and throw a flashlight beam into the house and frighten people; that children were afraid of her; that she threatened to cut the curls off of this witness's little daughter; and that she threatened to kill this witness over the blackberry episode. After these affairs Mary Wahl would put her arms around this witness, be remorseful, and declare that she did not know why she did such things.

Another witness testified that the testatrix remarked that she was not going to the hospital to see her husband when he was confined there by illness because he did not want her to come.

. Another close neighbor who had known Mary Wahl for 22 years testified that she would see her three or four times a day. She would often repeat the same things that she had told this witness just 30 minutes previous; she would come to this witness's home during the daytime and awaken her husband who worked nights; and that on occasions when she went to town she would forget her key and lock herself out of her home. She told this witness she did not like her son or her husband, and that she tore up letters written by her son so that her husband could not see them. She loaned this witness crutches when she had a broken leg and came after them when they had been used a short time and took them back, but continued to visit this witness as usual. She threatened to shoot a neighbor boy, and a gun was taken from her. She objected to food being furnished by a neighbor to her husband because she thought he was being treated too kindly.

This brings us to the expert testimony offered by the contestants. In this connection it might be remarked that it is not medical soundness of mind that governs, but testamentary capacity as legally defined.

"It is said that less mental faculty is required to execute a will than to enter into any other legal instrument; that the testator's property was his own, he had the

power to do with it as he chose, and while he may have had delusions, that does not of itself constitute incapacity, for a delusion affects testamentary capacity only when it enters into and controls its exercise." In re Estate of Frazier, 131 Neb. 61, 267 N. W. 181.

The question of testamentary capacity relates exclusively to the time when the will was made, and although competent evidence of testator's condition of mind long before, closely approaching, and shortly after the time of its execution is admissible, it is received only to assist in revealing his state of mind at that time, and the jury should be so instructed. See In re Estate of Woodward, *supra.*

A nonexpert witness who is shown to have had a more or less intimate acquaintance with a person may be permitted to state his opinion as to the mental condition of that person, if said condition becomes a material subject of inquiry, by giving the facts and circumstances upon which the opinion is based. It must appear that a witness, lay or expert, in giving his opinion as to mental capacity of a testator to make a will had in mind the quality of mental capacity essential to the making of a valid will. An expert witness will be permitted to give his opinion as to mental capacity if it is predicated on a proper and sufficient foundation. The opinion of a medical expert must be predicated on one or more of the following, examination and observation of the person who is the subject of the inquiry, examination and history, or supposed facts of which there is evidence. See In re Estate of Witte, 145 Neb. 295, 16 N. W. 2d 203, on rehearing, 145 Neb. 305, 17 N. W. 2d 477.

Dr. Spradling, associated with the state hospital, testified that he was acquainted with Mary Wahl; that she was committed to the hospital on the first occasion on January 21, 1934, from Lancaster County, having been transferred from a privately owned hospital for mental diseases; and that he examined her with the assistance of others to ascertain her physical and mental

condition, and diagnosed her case as cerebral arterio-sclerosis, which is a sclerosis or hardening or the blood vessels of the brain with a consequent destruction of portions of the brain resulting in an organic mental destruction or deterioration. He testified that she was paroled to her husband on March 28, 1934, and discharged on March 31, 1935. A parole or discharge does not signify that the patient has recovered. She was readmitted to the hospital in July 1942, from Richardson County. This witness supervised the examination of her at that time and diagnosed her condition as cerebral arteriosclerosis as previously, except that she was more seriously involved than formerly. She was paroled from the hospital on September 27, 1942, to her physician, and was returned by him to the hospital on October 13, 1942, where she was again examined, and her mental condition was found to be the same. Between the dates of January 21, 1934, and March 28, 1934, she was severely involved with a very evident mental illness. Her memory was faulty at times; she was unable to recognize those with whom she was intimate; she did not know her physician or attending nurses; and she failed to recognize them, even those who took care of her continuously. She was unable to remember time, and spoke of matters that were remote and of the past as though the events had happened yesterday. She was not amenable to suggestions. She would fly into rages with the doctors and nurses, and even assault them. She was quite variable. At other times her personality would change to being jocular or playful. She was definitely paranoiacal. She had delusions of persecution, thought that she was being done an injustice by her friends and the doctors and nurses. This witness further testified that cerebral arteriosclerosis is a result of a chronic condition and advancing age which gets progressively worse in time. Upon her readmission her condition was noteworthy. She had become untidy in dress and had a more pronounced manifestation of all

the symptoms with reference to the mental disease with which she was suffering.

After the hypothetical question which included facts as heretofore set out, the doctor testified that on August 16, 1940, and on October 25, 1940, the dates on which the will and codicil in question were made and executed, Mary Wahl was mentally ill, insane, and mentally incompetent to make a will or codicil thereto.

A doctor connected with a private mental hospital testified that he became acquainted with Mary Wahl on December 9, 1933, when she was brought to the hospital by her husband. She remained there until she was sent to the state hospital January 21, 1934. This doctor testified in a degree of exactitude with the testimony of Dr. Spradling as to the diagnosis of the mental disease of Mary Wahl, and gave as his opinion that she was mentally incompetent to make a will and codicil at the time when such instruments were made and executed.

The record discloses that the evidence was sufficient, under the rules heretofore announced, to warrant the experts in giving their opinions on the testamentary capacity of Mary Wahl at the time the will and codicil were made and executed.

The proponent's case-in-chief consisted of a number of witnesses such as a hardware merchant, a bank employee, a druggist, a storekeeper, a miller, and friends and acquaintances of Mary Wahl. Their testimony was to the effect that she was able to keep house, do her own cooking, was tidy in dress, able to buy and strike a good bargain, and had continuation of thought in the manner of transacting business. Some of these witnesses believed her to be eccentric, odd, or queer. They testified as to the foregoing at about the time the will and codicil thereto were made and executed. Neighbors and friends who had known her testified as to their visits with her, her trip to California to collect the $200 from her son, and her complaint that her son had locked her out of his home.

In 1942, prior to her recommitment to the state hospital, she purchased a lot. The attorney who made the deed and who had been acquainted with her for years testified that she was competent to make the deed. The surveyor who surveyed the lot to determine the boundary testified that she knew with some degree of exactitude where the boundary line was. His wife, who was present at the time of the survey and conversed with her, likewise testified that she was mentally competent. A young man who had worked for her at times in 1940, running errands and doing yard work, testified that she knew what she wanted done, and was competent.

Dr. Gillispie, who attended Mary Wahl on several occasions from 1936, testified as to her physical condition, and that on August 16, 1940, she was suffering with bladder cystitis. He testified that he observed her at the office, and treated her. As to the foundation for testifying as to her mental capacity on August 16, 1940, and October 25, 1940, his conception was that a person must know the value and extent of their property and to whom they wish to make distribution. He testified that in his opinion she possessed good mental capacity and was capable of making the will and codicil on the dates in question.

Dr. Shepherd testified that arteriosclerosis is a degenerative disease of the vessels. When asked if a mild form of arteriosclerosis in a person beyond middle age would affect the mentality of the person, his answer was: "Not unless the principle amount of your disease was in the brain." He was asked the question as to the ability of such a person to transact business such as buying necessary food and other equipment for the home, doing her own housework and cooking, and he answered: "Without more evidence you couldn't say she was in an advanced stage of arteriosclerosis." He further testified that the cerebral arteriosclerosis picture is that of an individual whose mentality begins to deteriorate; first a loss of memory is noticeable for recent

events, loss of tidiness, inability to transact or conduct business as previously, and a change in personality. These matters come on gradually. The extreme end is perfect senility.

It appears that later the attorney who had drawn the deed, then in the capacity of city attorney, went with the chief of police to Mary Wahl's home. She was in a state of excitement and, as he described it, "she was wild." He immediately wrote to her son in California about her condition and instituted the proceedings to have her sent to the state hospital.

It is impossible to set forth all the evidence in the opinion, however, the foregoing constitutes the relevant and material evidence which was submitted to the jury.

It is true that no right of a citizen is more valued and more assured by law than the power to dispose of his property by will. He is entitled to the control of his property while living, and by will to direct its use after his death, subject only to the restrictions which are imposed by statute. A testator may dispose of his property as he pleases. The law does not require that he recognize his relatives therein, nor does it put any obstacles in the way of the aged or infirm in making disposition of their property by will, provided only, that their mentality conforms to the accepted tests at the time of the execution of such testamentary instrument. See, In re Estate of Bose, 136 Neb. 156, 285 N. W. 319; In re Estate of Goist, 146 Neb. 1, 18 N. W. 2d 513; In re Estate of Scoville, *supra.*

Unjust, unreasonable, or unnatural provisions of a will are matters for consideration by jury as evidence tending to throw light on testamentary capacity. See, In re Estate of Kerr, *supra;* In re Estate of Bose, *supra.*

"An insane delusion such as will affect testamentary capacity is an idea or belief which has no basis in fact or reason and to which the testator adheres against reason and evidence, or, in other words, it may be stated to be a belief in a state of facts that does not exist and

which no rational person would believe to exist." 68 C. J., Wills, § 30, p. 433.

"Another form of insane delusion is a dislike for natural objects of testator's bounty, or repulsion for them, often based on an erroneous belief that such persons have been guilty of misconduct. If this belief is not based on evidence and can not be removed by evidence, it may amount to an insane delusion." 1 Page on Wills (Lifetime ed.), § 146, p. 299.

Where the testator is not claimed to have been generally insane, but controlled by insane notions with respect to a particular subject, the question to be determined is whether he was the victim of such delusions as controlled his actions and rendered him insensible to the ties of blood and kindred. See, McClary v. Stull, 44 Neb. 175, 62 N. W. 501; In re Estate of Kerr, *supra;* In re Estate of Frederick, 83 Neb. 318, 119 N. W. 667, on rehearing, 83 Neb. 321, 120 N. W. 1131.

An individual does not lack testamentary capacity because he holds an unjust prejudice or belief generally regarded as peculiar and unsound. A peculiar belief however may be material in connection with other circumstances in determining the question of mental capacity.

In the instant case the evidence discloses that the testatrix had formed more than an unjust prejudice or belief generally regarded as peculiar and unsound against her son. She developed toward him an unnatural, irrational, and unreasonable feeling evidenced by her feeling against girls whom she despised because of her extreme jealousy and fear that they would prevent and deprive her of the companionship of her son. This hostility toward the son was caused by a weakened and distorted mind with reference to him. The evidence in such respect was sufficient from which a jury might find that the testatrix was afflicted with an insane delusion which controlled her actions and rendered her insensible to the ties of blood and kindred, and prevented the exer-

cise by her of rational judgment touching disposition of her property.

Where evidence relating to mental capacity to make a will is conflicting, the issues of fact are questions for the jury. See, In re Estate of Kerr, *supra;* In re Estate of Hunter, *supra.*

In view of the evidence and the foregoing decisions, we conclude that the question of the testamentary capacity of Mary Wahl was a question for the jury to determine.

The proponent contends the trial court erred in refusing to permit the proponent to use additional witnesses for the purpose of showing testamentary capacity of the testatrix at the time the will and codicil were made. It appears from the record that 25 or more witnesses testified for the proponent with reference to the ability of the testatrix to transact business, to care and provide for her home, and with respect to her personal appearance before and at the time when the will and codicil were made and executed. Apparently there were additional witnesses present who might have testified to the same effect.

The law provides, in this state, that the trial court may exercise a reasonable discretion in limiting the number of witnesses to testify to a matter not in dispute, or to facts collateral to the main issue. See, Cate v. State, 80 Neb. 611, 114 N. W. 942; Biester v. State, 65 Neb. 276, 91 N. W. 416.

The proponent contends that the evidence to be given by the witnesses who did not testify would have gone to the main, essential issue involved in this case, that is, to testamentary capacity, and under such circumstances the trial court was not privileged to use a reasonable degree of discretion in limiting the number of such witnesses. The record fails to disclose that proponent made any offer of proof as to what these witnesses would have testified to had they been called to do so, which places this court in a position so that it cannot discern

what the testimony would have been, in the absence of the offer of proof.

Proponent relies upon Conlee v. Taylor, 153 Tenn. 507, 285 S. W. 35, 48 A. L. R. 940. In the cited case the trial court limited the number of witnesses who would testify as to the testamentary capacity of the testator. Counsel for the proponent made an offer of proof as to what these witnesses would testify to if permitted to do so, which is not true in the instant case.

In view of the state of the record we find no prejudicial error as contended for by proponent.

The proponent predicates error upon the trial court's refusal to admit evidence of a previous will made by the testatrix in 1939. Nebraska cases hold that former wills made by a testator are admissible in evidence if they were made at a time when the competency of the testator was unchallenged. The purpose of admitting a former will is to show that the testator had a constant and abiding scheme for the distribution and disposition of his property, and thus tends to refute a charge of a want of testamentary capacity. See, Blochowitz v. Blochowitz, 122 Neb. 385, 240 N. W. 586, 82 A L. R. 949; 57 Am. Jur., Wills, § 126, p. 118.

In the instant case the attorney who drew the will was called to testify that he had made a will for the testatrix in December 1939. He was asked whether he could recall what disposition she had made of her property, to which there was proper objection, and it was sustained. The same witness was recalled and the same question was asked, to which objection was made and sustained. The offer of proof was that in the former will the testatrix gave her home to her husband, and that practically all of the same legatees named in the will in question were also named in the will of 1939. The offer of proof was objected to and sustained.

The evidence for the contestant discloses that he challenged the testamentary capacity of the testatrix beginning in 1933, and at no time admitted that she

possessed testamentary capacity. There was no evidence to show what happened to the original will made in 1939, or whether or not it was lost or destroyed. There was evidence of an office copy of the will, but it was not offered nor a foundation laid for its admissibility. Under the circumstances we find no prejudicial error in denying the admission of the previous will in evidence.

The proponent contends the trial court erred in refusing certain instructions offered by him, and in giving certain instructions on the trial court's own motion. We have examined the instructions and the following authorities are applicable to the instructions given in the instant case.

Instructions are to be considered together, to the end that they may be properly understood, and when so construed, if as a whole they fairly state the law applicable to the evidence, error cannot be predicated on the giving of the same. See, Herman v. Firestine, 146 Neb. 730, 21 N. W. 2d 444; Pauli v. State, *ante* p. 385, 37 N. W. 2d 717.

A judgment will not be set aside because a more accurate statement of the law might have been made than that contained in certain instructions, when from a consideration of the instructions as a whole no prejudicial error appears. See Wright v. Cameron, 148 Neb. 292, 27 N. W. 2d 226.

We find no prejudicial error in the instructions given by the trial court.

The proponent contends the trial court committed prejudicial error in making certain remarks in the presence of the jury concerning evidence to be offered on testamentary capacity. The record reflects that after a number of witnesses had testified on behalf of the proponent on testamentary capacity, the trial court, upon objection of contestant's counsel, informed him that the court had gone into the matter with proponent's counsel, and then directed proponent's counsel to proceed with the examination of the witness. On another occa-

sion the court remarked that this was probably the last witness of proponent on the subject of testamentary capacity, and sustained the objection of the contestant's counsel on the ground that the evidence was cumulative. Under the circumstances we find no prejudicial error in the remarks so made by the trial court.

Other assignments of error are without merit.

For the reasons given herein, judgment entered on the verdict is affirmed.

AFFIRMED.