In re Estate of Mary E. Knott, deceased.
Margie I. Reynolds, appellant, v. Ralph Knott et al., appellees.

82 N. W. 2d 568

Filed April 19, 1957. No. 34085.

*Munro & Parker*, for appellant.

*Cunningham & Cunningham* and *Hamer, Tye & Worlock*, for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

On November 12, 1954, Margie I. Reynolds filed a petition in the county court of Buffalo County, seeking probate of the last will and testament of Mary E. Knott, deceased. The will, executed July 7, 1950, first revoked all former wills, codicils, or testamentary documents made by testatrix, and directed payment of debts and funeral expenses. It then bequeathed in substance as follows: (1) $50 to her granddaughter, Marie Viola Knott, the daughter of a deceased son, Clyde E. Knott (such beneficiary was not directly a party in this case, and her married name and address were unknown); (2) $50 to each of her granddaughters, Betty Jean Brownell and Fern Lorraine Brasel, also known as Lorraine Brasel, daughter of a deceased son, Joseph Ray Knott; (3) $100 to her son, Louis Ralph Knott, also known as Ralph Knott; and (4) $100 to her grandson, Archie B. Keup, son of a deceased daughter, Lillian Viola Keup. There-

after the will of testatrix gave, devised, and bequeathed all the rest and residue of her estate, including all real and personal property of whatsoever kind and nature, to her only living daughter, Margie Irene Reynolds, and nominated and appointed George A. Munro, her lawyer, as executor.

Thereafter, Ralph Knott, Archie B. Keup, Betty Jean Brownell, and Lorraine Brasel filed objections to probate of the will, alleging that it was not executed as provided by law; that testatrix lacked testamentary capacity to execute it; and that its execution was procured by the undue influence of testatrix's daughter, Margie I. Reynolds, and others. Proponent's reply thereto admitted relationship of the parties to testatrix, and denied generally.

After hearing upon the merits the county court rendered judgment in favor of proponent and against contestants, admitted the will to probate, and appointed George A. Monro executor. Therefrom, contestants appealed to the district court, where, upon comparable new pleadings duly filed, like issues were tried to a jury. At conclusion of contestants' evidence, proponent moved for directed verdict substantially upon the grounds that there was no evidence: (1) That the will was not duly executed as provided by law; (2) that testatrix lacked testamentary capacity; and (3) that there was not sufficient competent evidence that the will was procured by the exercise of undue influence as alleged. Thereafter the trial court sustained such motion in part, concluding as a matter of law that the will was duly executed as required by law, and that testatrix had testamentary capacity. In such respect, concededly the record conclusively supports that finding and direction. However, that part of proponent's motion with regard to undue influence was overruled, and such issue was submitted to the jury for its determination, after the court had overruled proponent's motion again made at conclusion of all the evidence to

direct a verdict for proponent upon the ground that there was not sufficient competent evidence that the will was procured by the exercise of undue influence.

The jury thereafter returned a verdict in favor of contestants and against proponent, finding that the will was not the valid last will and testament of Mary E. Knott, deceased. Judgment was rendered accordingly, with costs taxed to proponent, whose motion for judgment notwithstanding the verdict, or in the alternative for new trial, was overruled. Therefrom proponent appealed to this court, assigning, insofar as important here, that the trial court erred in failing to sustain her motions for directed verdict upon the issue of undue influence made at conclusion of contestants' evidence and again at conclusion of all the evidence, and erred in overruling proponent's motion for judgment notwithstanding the verdict. We sustain the assignment. As we view it, the sole primary issue is whether or not there was sufficient competent evidence adduced by contestants to support a verdict of undue influence. We conclude that there was not. Hereinafter, we will designate Mary E. Knott as testatrix and all other parties generally by their first names except when necessary to designate them otherwise as proponent or contestants.

In In re Estate of Scoville, 149 Neb. 415, 31 N. W. 2d 284, we held: "A testator may dispose of his property as he pleases. The law does not require that he recognize his relatives therein, nor does it put any obstacle in the way of the aged or infirm in making disposition of their property by will; provided, only, that their mentality conforms to the accepted tests at the time of the execution of such testamentary instrument." In other words, whether or not a testator was justified in making the provisions of a duly executed will is of no concern to the court, provided testator has testamentary capacity and the will was not procured by undue influence.

We have long established that in a will contest upon

the ground of undue influence the burden is upon contestants to prove by a preponderance of evidence each and all of the following elements: (1) That testator was subject to undue influence; (2) that there was opportunity to exercise undue influence; (3) that there was a disposition to exercise undue influence for an improper purpose; and (4) that the result was clearly the effect of such undue influence. Contrary to contestants' contention, we no longer recognize any exceptions to that rule. In re Estate of Hagan, 143 Neb. 459, 9 N. W. 2d 794, 154 A. L. R. 573; In re Estate of George, 144 Neb. 887, 15 N. W. 2d 80; Parkening v. Haffke, 153 Neb. 678, 46 N. W. 2d 117.

We have established as well that undue influence cannot be inferred from motive or opportunity alone. There must be competent evidence, direct or circumstantial, to show that undue influence not only existed but that it was exercised at the very time the will was executed. Mere suspicion, surmise, conjecture, or speculation is not enough to warrant a finding of undue influence, but there must be a solid foundation of established facts upon which to rest an inference of its existence. There may be influences directing the willmaker's attention to proper obligations which it might be thought ought to be satisfied by testamentary provisions. Such influences may be persuasive and effective, but so long as not coercive, they are not undue influence. Circumstances often arise where such conduct is proper and wholly justifiable. Also, in order to invalidate a will duly executed as provided by law by a testator having testamentary capacity, undue influence must be of such character as to destroy the free agency of the testator and substitute another's will for his own. In evaluating the testimony and proper inferences to be drawn therefrom, it is not always possible to apply the evidence tending to establish improper influence which is referable to the will solely to one of the essential elements. It is therefore permissible to rest the decision

upon whether or not the evidence as a whole is of such a substantial nature as to contain some competent and relevant proof of each of the essential elements, and require the issue of undue influence to be submitted to and determined by a jury. It is also the rule that in testing the sufficiency of evidence to support a verdict it must be considered in the light most favorable to the successful party, that is, every controverted fact must be resolved in his favor and he should have the benefit of every inference that can reasonably be deduced therefrom. See, Horton v. Maruska, 158 Neb. 723, 64 N. W. 2d 734; In re Estate of Fehrenkamp, 154 Neb. 488, 48 N. W. 2d 421; In re Estate of Bainbridge, 151 Neb. 142, 36 N. W. 2d 625; Jensen v. Priebe, 163 Neb. 481, 80 N. W. 2d 127; In re Estate of Scoville, *supra*.

In the last-cited case, quoting with approval from In re Estate of Inda, 146 Neb. 179, 19 N. W. 2d 37, and In re Estate of Frazier, 131 Neb. 61, 267 N. W. 181, we said: " 'It is the duty of trial courts to determine the issues upon which there is competent evidence and submit them, and them only, to the jury. In a will contest on the ground of mental incompetency and undue influence, if the evidence is insufficient to sustain a verdict upon either of such issues in favor of the contestants, then the trial court should withdraw both issues from the jury and direct a verdict.' * * *

" 'To justify the direction of a verdict, it is not necessary that there should be literally no evidence to go to the jury; it being sufficient that there is none that ought reasonably to satisfy the jury that the fact sought to be proved is established.' " See, also, In re Estate of Benson, 153 Neb. 824, 46 N. W. 2d 176.

In Parkening v. Haffke, *supra,* cited with approval in Eggert v. Schroeder, 158 Neb. 65, 62 N. W. 2d 266, we held: "The rule is well established in this jurisdiction, in a case of a gift and voluntary conveyance from a parent to his child or children, no presumption of fraud

or undue influence arises as between the parties thereto by the mere fact of the relation.

"The affection, confidence, and gratitude of a parent to a child which inspires the gift is a natural and lawful inference, and will not render it voidable, unless this influence has been so used as to confuse the judgment and control the will of the donor."

Also, in In re Estate of Bose, 136 Neb. 156, 285 N. W. 319, quoting with approval from Isaac v. Halderman, 76 Neb. 823, 107 N. W. 1016, we said: " 'Courts and juries are not warranted in setting aside last wills and testaments, and substituting in lieu thereof their own notions as to what a testator should do with his property, except upon satisfactory evidence. No right of the citizen is more valued than the power to dispose of his property by will. No right is more solemnly assured to him by the law. Nor does it depend in any sense upon the judicious exercise of that right. It rarely happens that a man bequeaths his estate to the entire satisfaction of either his family or friends. The law wisely secures equality of distribution where a man dies intestate, but the very object of a will is to produce inequality and to provide for the wants of the testator's family, to protect those who are helpless, to reward those who have been affectionate, and to punish those who have been disobedient. In this country a man's prejudices form a part of his liberty. He has a right to them. He may be unjust to his children or relatives. He is entitled to the control of his property while living, and by will to direct its use after his death, subject only to such restrictions as are imposed by law. Where a man has sufficient memory and understanding to make a will, and such instrument is not the result of undue influence, it is not to be set aside without sufficient evidence, nor upon sentimental notions of equality.' " That statement has particular application in the case at bar.

In the light of the foregoing rules, we have examined the voluminous record to determine whether or not the

evidence of contestants was sufficient to support a verdict in their favor upon the issue of undue influence. In doing so, we conclude that it was not.

In that connection, the record as summarized substantially discloses the following: Testatrix was 82 years old when she died in a hospital in Omaha on November 7, 1954, some 4 years and 4 months after execution of her last will and testament on July 7, 1950. She was a large woman, of sound mind and excellent mental capacity at all times until her death. However, she was badly crippled with arthritis which progressively grew worse, making it difficult for her to get around, particularly up and down stairs. From about 1940 until 1952 she lived alone most of the time in a little home in the north part of Gibbon. She had purchased same after her husband's death with funds received from the sale of personal property on an 80-acre farm here involved which she then owned and had rented to a satisfactory tenant. The title to her home in Gibbon was taken in the name of testatrix and her only living daughter, Margie I. Reynolds, as joint tenants with right of survivorship so that Margie would have a home if she did not make a go of it with her husband, Ray Reynolds, with whom testatrix was not even on speaking terms until several years after their marriage in 1933. However, often during the ensuing years testatrix visited with Margie, who lived in Fairbury for a time, then moved to Omaha. Testatrix spent a part of some summers and usually spent all of her winters with Margie, but returned in the spring to make out her income tax and prepare her home at Gibbon for summer occupancy. Also, Margie often came out to Gibbon to visit and care for testatrix, because other relatives failed and neglected to do so.

Naturally and by reason of necessity because there was no one else with whom she could counsel or advise, she discussed some of her problems with and sought advice about them from Margie and a real estate man

in Gibbon who was her neighbor and a close personal and business friend for many years. He testified as a witness for contestants that he thought testatrix was prone to and would sometimes because of such necessity listen to Margie's advice or his own if she were at a loss to know what to do, and asked for it, provided it was not anything wrong or evil, but she had a rather strong mind and followed her own wishes if she disagreed.

In that connection, from 1949 to 1952, testatrix gradually became so crippled with arthritis and disabled from dropsy that she could no longer live alone and take care of herself. She then of necessity turned to Margie who was the only member of her family who would take care of her, and she wanted Margie to look after her business affairs. In that situation, in 1952 testatrix reluctantly sold her furniture, broke up housekeeping, closed and rented her home in Gibbon, and went to live with Margie in Omaha. In or just before 1954 her old farm tenant had bought a farm of his own, so at request of testatrix she was brought back to Gibbon by Margie to meet and visit with a new tenant on her farm in order to determine whether or not he would be a satisfactory tenant.

In the meantime, during 1943 Ralph Knott, the only living son of testatrix, who was a contestant here, bought and moved into a home at Gibbon. It was located a block west of the home of testatrix, with only one house separating them. Ralph and his wife, Marie, had cared for testatrix once when she was ill for a period of time in 1942, and testatrix made the down-payment on that home for them where they lived in Gibbon until 1948 when they moved out on a farm north of Gibbon. From 1943 until about 1946 or 1947 they and their family were generally friendly with testatrix. However, at about that time, Ralph evidently wanted to replace the satisfactory farm tenant of testatrix and move out on her farm. She did not consent to that, and hard feelings

resulted for which, as a conclusion without any factual foundation, he blamed Margie.

In 1947 testatrix fell while crossing an alley near her home and was severely injured, as a result of which she was confined to her bed 3 or 4 days and then could sit up in a rocking chair part time but needed nursing care and attention for about 3 weeks or more. Although Ralph and his wife were notified at once of her accident and injuries neither of them ever came to see testatrix, which caused her great grief and anxiety. During such period and for sometime thereafter near neighbors and friends nursed, cared for, and fed testatrix until she recovered. As a matter of fact, concededly Ralph never went to see, talked with, or wrote to his mother, the testatrix, during 1947, 1948, 1949, and 1950, which was a constant source of grief and anxiety to testatrix. He claims that he saw her once in 1951 when he invited her to dinner, but she did not come. Concededly, he went once to her home in 1952 when she was selling her furniture and breaking up her housekeeping in order to go and live with Margie in Omaha. However, concededly while there, with loud and profane language addressed to Margie and Ray, he questioned the right to sell her furniture without his permission or a court order, and tried to stop the sale. From that moment until her death neither he nor his wife ever wrote to testatrix or saw her again even during her last illness and death in 1954, although they were informed of it. Ralph claimed that once in 1952 or 1953 he went to Omaha to see her but she had then gone back to Gibbon and neither he nor his wife ever thereafter wrote to her or made any further effort to see her again during her lifetime. Further, on September 25, 1947, and again on September 16, 1950, Ralph's wife Marie wrote testatrix insulting letters framed with hatred, seeking to shame testatrix and prejudice her against Margie, against the farm tenant of testatrix, and against the family of Archie B. Keup, grandson of testatrix, who is a contestant here.

Marie testified that in 1946 or 1947 testatrix had told her that she wanted to divide her property equally but she didn't want certain granddaughters to have anything.

Ralph, his wife, and Archie all testified that about 1946, 1947, or 1948, testatrix told them that Margie and Ray had wanted her to will the farm to them, then come to live with them, and they would take care of her for the rest of her life, but she wanted to divide her property equally except as aforesaid, and not live with any of her children. They testified also that about that time testatrix wanted to trade her home for another more modern, fairly new one in Gibbon, but Margie advised against it because it involved too much money. In that connection, they knew nothing about the terms of the transaction or whether it was a good or bad deal, and it will be remembered that Margie was a joint owner of the home in which testatrix lived, and had a perfect right to counsel and advise her with regard to the transaction. She also advised against it because the other house involved was a two-story, or one and one-half story, house with two rooms upstairs, and a basement with cellar steps which testatrix could not climb because of her physical condition. On the other hand, the home in which she lived was comfortable with only a couple of steps to enter it. It also had a basement where she kept vegetables and fruits, but generally when necessary either the neighbors or children of Ralph or Archie traversed cellar steps for her.

Ralph and his wife testified that about the time testatrix wanted to procure the new home she also wanted to purchase a new bedroom suite and a decorative bronze horse which she admired, but Margie advised otherwise, saying that testatrix did not need them. However, she bought them anyway.

Archie, a grandson, lived with testatrix and her husband out on the farm from the time he was 4 years old until he was out of high school in 1929, when he left and,

after working around a couple of years, moved to Peru, Nebraska. He saw testatrix only 3 times from 1931 to 1942 when he finally moved back to Gibbon, and lived in a home about 2 blocks from testatrix, who made the down-payment on that home for him. From that time he saw testatrix quite often except while he was away for several months at different times. After 1952 he saw her but once in May 1954 while she was seriously ill at Margie's home in Omaha. Before 1952 some of his 10 children, 8 of whom lived at home, saw testatrix often and helped her when necessary. Also, he sometimes took testatrix about in a car when she wanted to go.

Archie testified that in the summer of 1949 he saw a typewritten copy of a will allegedly made by testatrix which, if he remembered correctly, gave him one-third, Margie one-third, and Ralph one-third of her property, with a bequest of money to some other grandchildren. Ralph's share as he remembered it was put in trust so that he would receive $100 a month as long as his share lasted, but if Ralph or Margie died before testatrix, their share went to Archie's children who were the great grandchildren of testatrix. No such will appears in the record, although it was conceded that on February 22, 1949, testatrix had made a prior will.

Archie also testified that in 1950 he talked to Margie who said that testatrix was failing in health, and they were going to have to move someone in with her in order to take care of her, but he objected to that because she always was a very independent person who transacted her own business and wanted to take care of herself. He also testified that on July 8, 9, or 10, 1950, testatrix, Margie, and Ray came in a car over where he was working, at which time testatrix was crying and said that since she could not take care of herself any more, she guessed she would have to live with Margie, and he replied that it was all right to do that.

Archie testified further that sometime about 1947 or 1948 testatrix told him that her farm tenant wanted her

to put in a hot water system, then leave it as part of the farm. The tenant also wanted her to put in some posts for a corral, and shingle the barn and corn crib. However, Margie advised her that it would be a waste to spend her money for such improvements out of her income from the land without getting any greater return from it. Nevertheless, testatrix made some of such improvements. In that connection, it would seem logical that if Margie was using undue influence to get the farm, as claimed, it would have been good judgment for her to have advised testatrix to make such improvements out of her income therefrom so that Margie could eventually have a better and more valuable farm at her mother's expense.

There is evidence that Archie drank excessively and spent his money for intoxicating liquor instead of for the care and support of his family and children, who were in a deplorable condition without proper food and clothing, which disturbed and worried testatrix, so she sewed for them, gave them food, and paid them small sums of money for services rendered for her. Archie testified that after the death of testatrix, and the will had been read to the family, Margie, using his nickname, said: " 'Ikey, I suppose there'll be a big stink raised over this. * * * if you'll just stick with me and meet me half way I'll see that you're taken care of.' " In that connection, we cannot see how, under the provocative circumstances presented in this case, such a statement tended in any manner to prove that the will of testatrix was procured by undue influence.

Another witness for contestants testified by deposition. She was formerly the wife of Joseph Ray Knott, a deceased son of testatrix, who was the father of contestants, Betty Jean Brownell and Lorraine Brasel. She was a school teacher who left Nebraska and went to California in 1945 or 1946, but generally returned for short visits with testatrix and others in Gibbon during summer vacations. She testified that she was not in-

terested in getting any money from the estate for her daughters but she felt sorry for Ralph and Archie, had contributed $100 which they needed, and was doing her best in order to help them carry on and win this litigation. She was not sure when it occurred, but testified that on several occasions testatrix had told her Margie and Ray wanted testatrix to will her farm to them, then come to live with them, and they would take care of her for the rest of her life, but she wanted to leave her property equally and not live with any of her children. In that connection, she also testified that testatrix was a rather strong-willed person and did not once part with any of her property while living, except when she had helped different ones at times.

Contrary to contestants' contention, we find no competent evidence adduced by them from which it could be reasonably concluded that from 1946 until the death of testatrix, Margie ever neglected, failed, or refused to give her necessary loving care and attention when contestants refused or failed and neglected to do so.

We come then to the manner of execution of the will. In that connection, due execution thereof was properly disposed of as a matter of law, but we summarize the undisputed evidence with regard thereto for whatever bearing it may have if any upon the issue of undue influence. A short time before July 7, 1950, testatrix wrote Margie telling her that she had some legal business to transact with her lawyer, George A. Munro at Kearney, and asking if Margie and Ray would come to Gibbon and take her there. In response, they came on July 6, 1950, and took testatrix to her lawyer's office on July 7, 1950. His office was located on the second floor up a long stairway. They arrived about midmorning, without prior appointment, and assisted testatrix up the stairs to her lawyer's office. There, and before that, she said that she had to have somebody appointed to look after her affairs because she was no longer able physically to get around and do so, and she

requested Margie to act in that capacity. Thus in her lawyer's office, as advised by her lawyer and at request of testatrix, conservatorship papers were first drawn, then executed by testatrix, and Margie was duly appointed by the county court. Contrary to contestants' contention, such proceedings, as shown by contestants' evidence, appear to have been regular in every material respect. Thereafter, Margie acted as conservator from July ·7, 1950, until June 14, 1955, when, over objections of contestants here to her final account and report, which were overruled, she was discharged by the county court in an order which became final, reciting in substance that she had in all things faithfully and fully performed and discharged all and singular her duties and obligations imposed upon her by law and orders of the court, and had duly and fully acted for and administered all of the estate coming into her possession as conservator.

After conservatorship papers were drawn and executed, testatrix told her lawyer, " 'I want to change my will.' " Her lawyer then told Margie and Ray to leave and let him talk to testatrix alone in his private office. They then did leave, and while alone in her lawyer's office her will here involved was prepared as directed by testatrix. It was then read to her, and after approval of its provisions, her will was duly executed in every respect as provided by law. Margie and Ray knew of its execution but did not know its contents. They came back to the lawyer's office about 3:30 p. m., helped testatrix down the stairs, and later drove back to Gibbon with her.

Contestants lay particular stress upon the fact that testatrix stayed in her lawyer's office alone for lunch which Margie had brought up to her, but we see nothing unusual or wrong with that fact since it is clear that she stayed there simply because her business transactions had not yet been completed and she was physically unable to get up and down the long stairway again.

As we view it, there was opportunity for Margie and Ray to exercise undue influence. On the other hand, there was no sufficient competent evidence adduced by contestants that testatrix was a susceptible person who would be subject to undue influence or that there was a disposition by Margie and Ray to exercise undue influence for any improper purpose, and under the unusual circumstances presented in this case, the result was a natural one which did not clearly show the effect of undue influence. No presumption of fraud or undue influence arose simply because Margie was the daughter of testatrix, since the affection, confidence, and gratitude of testatrix to her was, under the circumstances heretofore recited, a natural and lawful influence, unless it had been used to confuse the judgment and control the will of testatrix, which contestants failed to establish by sufficient competent evidence. Further, as conservator from July 7, 1950, until the death of testatrix, Margie had a right and duty to counsel and advise with her as she did, and in such respect Margie was subject to the orders of the county court at all times.

For reasons heretofore stated, we conclude that the trial court should have sustained proponent's motion to direct a verdict for proponent upon the issue of undue influence made at conclusion of contestants' evidence. Therefore, the verdict and judgment of the trial court were clearly wrong and the judgment should be and hereby is reversed and the cause is remanded with directions to sustain proponent's motion for judgment notwithstanding the verdict, and render judgment accordingly for proponent and against contestants. All costs are taxed to contestants.

REVERSED AND REMANDED WITH DIRECTIONS.