IN RE ESTATE OF LAURA B. GORTHY, DECEASED. ANNA L. BENGE, APPELLEE AND CROSS-APPELLANT, V. HAZEL SUTTON, APPELLANT AND CROSS-APPELLEE.

100 N. W. 2d 857

Filed February 11, 1960. No. 34676.

*Daniel E. Owens* and *Ross D. Druliner,* for appellant.

*Leon C. Hines* and *George B. Hastings,* for appellee.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CARTER, J.

This is a contest of the will of Laura B. Gorthy, deceased, on the ground of her incompetency when the will was made and that it was the result of undue influence. The trial court determined as a matter of law that deceased was competent at the time she made the will and submitted only the issue of undue influence to the jury. The jury found by its verdict that the will was the result of undue influence. The trial court sustained a motion for a new trial because of an erroneous instruction given to the jury. The contestant has appealed, asserting that there was no prejudicial error in the record and that the order of the trial court should be reversed and her verdict reinstated. By cross-appeal the proponent contends that the trial court erred in refusing to grant her motion for a directed verdict and in not sustaining her motion for judgment notwithstanding the verdict. No contention is made on this appeal that the trial court erred in holding as a matter of law that Laura B. Gorthy was competent at the

time she made the will involved in this contest.

James Gorthy and Laura B. Gorthy, after their marriage in 1888, established their home on a farm in Cheyenne County, Kansas, where they resided until 1914. During these years they accumulated 1,680 acres of farm land which became involved in this litigation. Five children were born as a result of this marriage: Walter Gorthy, Paul Gorthy, Hazel Sutton, Mildred Smith, and Anna L. Benge, who will hereafter be referred to by their given names. Anna was the youngest child and was 53 years of age at the time of the trial. Paul died in 1940, leaving his widow, Vera, and two children, Paul Gorthy, Jr., and Anna Daurene Maring, both of whom have reached their majority. This group, exclusive of Anna, will be collectively referred to as the heirs.

In 1914 James and Laura B. Gorthy left the farm and moved to Benkelman, Nebraska, where they spent the remainder of their lives. About 1918 James Gorthy built a new home in Benkelman, which is referred to in the record as the "big house." While living in Benkelman, James Gorthy acquired several town properties which included places of business, small residences, and some cabins. He managed his own business affairs until he suffered a stroke of paralysis in 1945. From the date of James Gorthy's illness Laura B. Gorthy managed his affairs until his death on May 5, 1950. James Gorthy left all of his property to Laura B. Gorthy, who managed it until she fell and broke a hip in November 1952. Thereafter, until her death on June 23, 1956, she was assisted in the management of the property by her daughter, Anna.

Laura B. Gorthy, after the death of James Gorthy, filed her petition for the probate of the will of James Gorthy and prayed that she be appointed administratrix with will annexed. The will nominated Hazel to be the executrix of the estate. The hearing on the petition offering the will of James Gorthy for probate was set

for June 12, 1950. On the day preceding, to wit, June 11, 1950, Hazel was instrumental in calling a family meeting at the home of Laura B. Gorthy to find out where the heirs stood with reference to the property then belonging to Laura B. Gorthy. Anna was not invited to attend until the other heirs, except Mildred who resided in California, had convened. Anna was called and came to the meeting some time later. The heirs, other than Anna, had consulted a lawyer previous to the meeting. After a complete discussion of their family affairs and an indication by Laura B. Gorthy that she thought her will executed in 1939 was about right, Anna called Leon Hines, her mother's attorney, to the meeting. He arrived about 10 p.m. In the meantime Ross Druliner, the attorney for the heirs, was called and had arrived. After some further discussion Hines said to Laura B. Gorthy: "* * * you don't have to sign anything, I will take care of you, and to hell with the rest of them." The meeting immediately broke up and ended all further attempts by the heirs to enter into a contract with their mother, Laura B. Gorthy, concerning the distribution of her property on her death.

On the following day, June 12, 1950, the hearing on the petition to probate the will of James Gorthy was held in the county court of Dundy County. Hazel objected to the appointment of her mother, Laura B. Gorthy, as administratrix with will annexed and insisted upon her appointment as executrix in accordance with her nomination contained in the will. The county court appointed Laura B. Gorthy administratrix with will annexed. Hazel appealed to the district court which, after trial, sustained the appointment of Laura B. Gorthy.

On January 8, 1951, approximately 6 months after the hearing on the probate of the James Gorthy will, Laura B. Gorthy called Leon Hines to her home and advised him that she had concluded to make a will and

asked him to prepare it for her. He discussed the terms of the will and caused a preliminary draft to be prepared. He went over it with Mrs. Gorthy and made the changes she desired. The will was redrawn to the satisfaction of Mrs. Gorthy. On the evening of January 13, 1951, Leon Hines took the will to the home of Mrs. Gorthy and in the presence of three witnesses summoned by her the will was duly executed.

On the same day she made her will Laura B. Gorthy executed a deed to Anna for the identical real estate devised to her by the will. The deed was prepared by Leon Hines and acknowledged by Mora Herring, his secretary. Laura B. Gorthy handed the deed to Anna on the following day in a sealed envelope and requested her not to open it. Anna took the sealed envelope to Leon Hines, who retained it. It was found in the files of Leon Hines after his death. Anna did not see the deed until the Saturday previous to the trial of the instant case in the district court. When produced, it showed a statement had been typed on the face of the envelope. Mora Herring testified that she had typed the statement which was placed on the envelope at the time when Anna delivered the sealed envelope at the office of Leon Hines. The statement was: "This envelope contains a deed from Laura B. Gorthy to Anna L. Benge. Deposited with me for safe keeping on January 13, 1951, to be delivered to Anna L. Benge upon demand. Delivery made by Anna L. Benge." The deed was never recorded.

On February 4, 1956, more than 5 years after she executed her will, Laura B. Gorthy decided to execute deeds to her real estate for her heirs. She requested Leon Hines to prepare the deeds, which he did. Due to the serious illness of Leon Hines, attorney Dan Owens was present at the delivery of the deeds on the recommendation of Leon Hines. Laura B. Gorthy called the heirs to her home, all of whom came except Mildred, who resided in California. She delivered the

deeds with the statement: "I want to give it to you myself because I don't want any more trouble in court over this estate." The deeds, which reserved a life estate in Laura B. Gorthy, were accepted and recorded. Since the death of Laura B. Gorthy the heirs have retained the real estate conveyed by the deeds, including all of the income therefrom.

The record indicates that several suits were commenced by the heirs against their mother with reference to the ownership of certain improvements placed upon the lands, as shown by an answer filed by her in the district court for Dundy County on January 15, 1951, all of which was in addition to the litigation in connection with the James Gorthy will. It is evident that these actions were commenced prior to January 13, 1951, the date of the execution of the last will of Laura B. Gorthy.

The foregoing factual situation existed when Laura B. Gorthy died on June 23, 1956. Anna thereupon petitioned for the probate of the will of Laura B. Gorthy. Objections were filed by Hazel on the ground, among others, that the will was the result of undue influence on the part of Anna. The county court admitted the will to probate and appointed Anna as administratrix with will annexed. Hazel gave notice of appeal to the district court, where a trial was had to a jury. This appeal is from a final order resulting from that trial.

The evidence offered by the proponent is substantially as follows: Anna is the youngest child of James and Laura B. Gorthy and was 53 years of age at the time of the trial. She had moved to Benkelman with her parents in 1914. She had attended the University of Nebraska for 2 years and had been a teacher in the public schools in and around Benkelman for some 30 years and was so engaged at the time of trial. She was married to Boyd Benge in 1941 when she was about 36 years of age. She had resided with her parents in Benkelman until her marriage, except when she was

attending college or necessarily away on account of her teaching. After her marriage she and her husband rented a home in which they lived. About a year after her marriage they rented a residence from Mrs. Gorthy and paid her $35 a month as rental until the latter's death. Her parents resided in the "big house" until some time after her father's death, when Mrs. Gorthy moved into a small residence, which she owned, located across the alley from Anna's residence. Anna testified that she and her mother were very close in their relationship and that she looked after her mother more and more as she grew older. In her mother's later years she was in and out of her mother's home several times a day and night in attending to her needs. Anna was present at the family gathering at the "big house" on June 11, 1950. She testifies that her mother became angry and upset because of the attempts by the heirs to get her to agree to the disposition to be made of her property on her death. She admits that she caused Leon Hines to be called to this gathering. She denies that Leon Hines was her attorney and asserts that he was at all times the attorney for Laura B. Gorthy. She testifies that her mother was hurt by the conduct of the heirs and stated repeatedly that she could not understand what they were trying to do to her. She testifies that her mother told her on January 13, 1951, that she had some business to attend to and that she desired her, Anna, to remain at home that evening. Her mother informed her the next day that she had executed a will the evening before and at that time handed her a sealed envelope in which, her mother stated, was a deed. Her mother asked her not to examine the deed, and in conformity with her mother's wishes she delivered the sealed envelope to the office of Leon Hines the next day, as has been heretofore related. She says she was not consulted about the will and did not know its contents until after her mother's death. She says also that she did not see the deed until the Saturday before the trial,

as heretofore related. She was present when the deeds were delivered to the heirs on February 4, 1956, and she did not know that they were in conformity with her mother's will until after her mother's death.

Anna testified that her father managed his own affairs until he suffered a stroke of paralysis in 1945, after which her mother handled their affairs until she broke her hip in November 1952. Thereafter Anna assisted her mother in handling her properties. She kept her mother's bank account separate from her own. She says, and the records corroborate her statement, that the income from her mother's properties went into her bank account and only her mother's expenses were paid therefrom. She testifies that her mother voluntarily placed the bank accounts in joint tenancy with her in order that Anna could pay her mother's expenses when she was unable to do so. She testifies that she placed no funds of her own in these accounts and drew none out for her personal benefit until after her mother's death. The bank records in evidence support Anna's statements except for one check for $600 which will hereafter be referred to.

One of the witnesses to the will of Laura B. Gorthy, Dr. G. Albert Morehouse, was called as a witness at the trial. The other two witnesses to the will were non-residents of the state and were not available to testify. Dr. Morehouse testified that he had known Mrs. Gorthy since he was a small boy. On January 13, 1951, she asked him to come to her home, which he did about 7 p.m. Leon Hines was present with a will, which he had prepared, along with the two other witnesses, Dr. Wright and Rev. Woodworth. She informed them that she was about to execute her will. She talked of her children and her properties and evidenced a full and complete knowledge of both. Dr. Morehouse states that she knew exactly what she wanted to do with her property and stated that the prepared will was exactly what she wanted. Because of the provisions of the

will favoring Anna, Dr. Morehouse asked her if Anna had influenced her in any way. In answer thereto she expressed concern about the treatment accorded her by her other children and expressed some fear that trouble and litigation would ensue. She expressed her desire to give one-half of the estate, which she considered her husband's half, equally to all her children, including Anna. She stated that she desired to give the other half, which she considered her half, to Anna. The evidence of Dr. Morehouse was that she fully understood what she was doing and intended it to be exactly as the will provided.

The evidence adduced by the contestant was substantially as follows: Their mother had made a will in 1939 wherein the 1,680 acres of land in Cheyenne County, Kansas, were devised to her children, other than Anna who was devised real estate in Benkelman. The meeting of June 11, 1950, was described as a family gathering called for the purpose of ascertaining the interest each was to have in their mother's property. There is little conflict in the evidence as to what occurred at this meeting. Witnesses for contestant do say that Anna, before calling Leon Hines, made the statement that it was about time for her to call her lawyer. Contestant and her witnesses testify that there was a coolness between Mrs. Gorthy and the heirs after the June 11, 1950, meeting. They say that family ties were strained from that time on and that it became impossible to discuss family matters as before. The heirs admitted that they resisted the appointment of Mrs. Gorthy as administratrix with will annexed in the James Gorthy estate matter. They admitted the bringing of other actions against Mrs. Gorthy. Walter testified that he attempted to patch up the family troubles with Anna after their mother's death, without success. He quotes Anna as saying: "I will spend every god dam cent I got before I let her (Hazel) have one cent." Anna denies that she ever made any such statement.

Hazel likewise testifies to the bad feeling her mother had toward the heirs after the June 11, 1950, family meeting. Their evidence indicated that there was bad feeling between Mrs. Gorthy and Anna on one side and the heirs on the other. Hazel testifies to some conversation with her mother when the latter was in the hospital shortly before her death. She quoted her mother as saying: "There was a few things, Hazel, I tried to straighten out, it got beyond my control and I couldn't do anything about it, will you forgive me?" Also, "I tried to change a few things and then it got out of my hands, and oh, Hazel, I couldn't do anything about it then." And further, "Never trust your business to somebody else, Hazel." Hazel testifies that her mother suffered mentally and asked their forgiveness for what she had done.

On cross-examination Anna admitted that a check for $600 had been given to an automobile dealer on Mrs. Gorthy's account in her lifetime. Anna testified that she had agreed to trade in her old car for a different one and that her mother agreed to and paid the $600 cash difference.

There is also the evidence of a cousin of Anna's that she heard Anna say, some time prior to her father's death, that her father must not outlive her mother. Anna denies that she said this.

The foregoing, we think, is a fair summary of the evidence in a record of more than 350 pages and numerous documentary exhibits. It is the contention of contestant that the will was the result of undue influence on the part of Anna. There are some implications, also, that Leon Hines played some part in procuring the result. We find nothing in this record to indicate that Leon Hines did not at all times conduct himself as an ethical and trustworthy lawyer and counselor to Mrs. Gorthy, or that he failed in any respect to carry out the latter's expressed desires.

We have carefully examined the evidence in this

record and have come to the conclusion that it is insufficient to sustain a finding that the will was procured by the undue influence of Anna or any other person. We shall elaborate upon the evidence of contestant and its apparent deficiency.

There is nothing in this record to indicate any family differences prior to the family gathering on June 11, 1950. This was before the will of James Gorthy had been admitted to probate. The meeting was instigated by the heirs, who evidently had some feeling that their interests were different than Anna's since she was belatedly invited to the family gathering. All agree that after this family gathering their mother's attitude toward her children other than Anna materially changed. The evidence clearly indicates that Mrs. Gorthy was concerned and resentful of the attempts by the heirs to establish their claimed rights in her property. We find no evidence of undue influence on the part of Anna at this family gathering. The evidence would indicate that their manner of calling and conducting the meeting had caused Mrs. Gorthy to become angry, displeased, and hurt. It is true, of course, that Anna and her mother enjoyed a close relationship, cemented in part no doubt by the willingness of Anna to care for her mother and father during ill health and old age, while others with the same moral obligations were apathetic about it. Such conduct is to be commended and, standing alone, is no evidence of undue influence.

There is evidence in the record of certain statements made by Mrs. Gorthy to Walter and Hazel while she was in the hospital shortly before her death in which she asked them foregiveness for what she had done. The evidence came into the record without objection. But disregarding its self-serving character and the fact that Mrs. Gorthy because of her death was not available to give her version, the evidence is not subject to the interpretation which the contestant would have us give it. Mrs. Gorthy was no doubt concerned about her

relationship with her children and at that time desired their forgiveness for any contributions she had made to it.  But it is quite noticeable that she did not say she in any way regretted making her will as she did.  If she had any desire to undo what she had done she was not foreclosed from doing it.  She could have corrected an undesired disposition of her property at that time by the simple expedient of executing a new will.  Walter and Hazel did not gather from her statements that she desired to change her will.  It is quite evident that she had no such desire, although she regretted the family quarrels that resulted from it.

The evidence shows that at the time Laura B. Gorthy executed her will she had formulated a definite pattern for disposing of her property.  She stated she intended to devise one-half of the property, her husband's half, as she described it, equally among her children, and that she desired to give her half to Anna.  She followed this pattern in making the deed to Anna at the time she executed her will, or shortly thereafter.  She adhered to that same pattern when, more than 5 years later, she executed deeds to the heirs in an attempt, as she said, to keep the estate out of court.  She accomplished this result with the aid of her attorney, Leon Hines, who advised her of her rights and assisted her in carrying out her wishes.  There is no evidence in this record that Anna was Mrs. Gorthy's adviser or consultant in these matters.  In fact, the record discloses an intent on the part of Mrs. Gorthy to rely on Leon Hines, her attorney, in making disposition of her property and to avoid discussion of that subject with Anna.

A testator may dispose of his property as he pleases.  He is not required to recognize his relatives, and the law places no obstacle in the way of the aged or infirm in making disposition of their property if their mental capacity is in conformity with accepted tests at the time of the execution of the testamentary instrument, and the will was not procured by undue influ-

ence. In re Estate of Scoville, 149 Neb. 415, 31 N. W. 2d 284. No right of a citizen is more valued than the power to dispose of his property by will. The right is in no manner based upon its judicious exercise. The very purpose of a will is ordinarily to produce inequality among heirs of the same class for reasons that appear sufficient only to the testator. He may desire to benefit the helpless, to reward the affectionate, and to punish the disobedient. He may be unjust to his children or other relatives. He is entitled to the control of his property during his lifetime and to direct its disposition after his death, subject only to the legal requirements as to mental capacity and that the act is his own and not the will of another resulting from undue influence. Where a testator has the required mentality to make a will and he has not been unduly influenced in its making, courts are without authority in any manner to interfere with the disposition he has made of his property. Reynolds v. Knott, 164 Neb. 365, 82 N. W. 2d 568.

In a will contest upon the ground of undue influence the burden is upon the contestant to prove each of the following elements by a preponderance of the evidence (1) that testator was subject to undue influence; (2) that there was opportunity to exercise undue influence; (3) that there was a disposition to exercise undue influence for an improper purpose; and (4) that the result was clearly the effect of undue influence. In re Estate of Hagan, 143 Neb. 459, 9 N. W. 2d 794, 154 A. L. R. 573; Reynolds v. Knott, *supra.*

In Reynolds v. Knott, *supra,* it was said: "* * * undue influence cannot be inferred from motive or opportunity alone. There must be competent evidence, direct or circumstantial, to show that undue influence not only existed but that it was exercised at the very time the will was executed. Mere suspicion, surmise, conjecture, or speculation is not enough to warrant a finding of undue influence, but there must be a solid foundation of established facts upon which to rest an

inference of its existence. There may be influences directing the will-maker's attention to proper obligations which it might be thought ought to be satisfied by testamentary provisions. Such influences may be persuasive and effective, but so long as not coercive, they are not undue influence. Circumstances often arise where such conduct is proper and wholly justifiable. Also, in order to invalidate a will duly executed as provided by law by a testator having testamentary capacity, undue influence must be of such character as to destroy the free agency of the testator and substitute another's will for his own."

"It is the duty of trial courts to determine the issues upon which there is competent evidence and submit them, and them only, to the jury. In a will contest on the ground of mental incompetency and undue influence, if the evidence is insufficient to sustain a verdict upon either of such issues in favor of the contestants, then the trial court should withdraw both issues from the jury and direct a verdict." In re Estate of Inda, 146 Neb. 179, 19 N. W. 2d 37. See, also, In re Estate of Frazier, 131 Neb. 61, 267 N. W. 181.

After an examination of the whole record we conclude that the evidence is sufficient to sustain a finding that Anna had the opportunity to exercise undue influence. We find no evidence that Mrs. Gorthy was subject to undue influence, or that Anna had a disposition to exercise undue influence, or that the result, under all the facts shown, was clearly the effect of undue influence. We think the trial court was in error in submitting the issue of undue influence to the jury.

This holding makes it unnecessary for us to discuss other assignments of error presented on this appeal.

The judgment of the district court is reversed and the cause remanded with directions to the trial court to sustain the motion of proponent for judgment notwithstanding the verdict.

REVERSED AND REMANDED WITH DIRECTIONS.