IN RE ESTATE OF ALICE STIDWORTHY, DECEASED.
ADA S. WESTOVER, APPELLEE, v. HELEN S. KERR ET AL.,
APPELLANTS.

96 N. W. 2d 421

Filed May 8, 1959. No. 34461.

*Doyle, Morrison & Doyle*, for appellants.

*Chambers, Holland, Dudgeon & Hastings*, for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

In this action, the last will and testament and three codicils thereto of Alice Stidworthy, deceased, were admitted to probate after a contest in the county court of Lancaster County. Therefrom contestants Helen S. Kerr and Margaret S. Coryell appealed to the district court. The petition of proponent Ada S. Westover on appeal alleged that Alice Stidworthy, a resident of Lancaster County, died in said county on or about July 9, 1956, leaving a last will and testament consisting of a will dated February 16, 1942, a codicil dated June 20, 1951, a second codicil dated March 31, 1952, and a third codicil dated November 3, 1953, each and all of which were executed in due form of law and filed in the county court July 12, 1956. Proponent alleged that at the time of the execution of each and all of said instruments Alice Stidworthy was of sound mind and disposing memory; that Ada S. Westover is executrix named in said will and is competent and qualified to act as such; that testatrix died seized of an estate in Lancaster County; and that at the time of her death she was a widow who left as her heirs at law three daughters, all of lawful age, namely Helen S. Kerr, Ada S. Westover, and Mar-

garet S. Coryell. The prayer was for admission of the will and codicils to probate, and for related relief.

The answer of contestants objected to probate of the will dated February 16, 1942, alleging that it was not the last will and testament of deceased; that the instrument was not executed in the manner provided by law; and that it was obtained by undue influence. Also, contestants objected to probate of each and all of the three codicils and alleged that testatrix lacked testamentary capacity to execute same; and that at the time of the purported execution, Ada S. Westover, a beneficiary thereof, occupied a confidential relationship with testatrix which was violated and used for the purpose of securing beneficial provisions in said codicils to herself by misrepresentation of fact and undue influence upon the mind of testatrix. Proponent's reply was a general denial.

The issues were tried to a jury in a long trial whereat evidence was adduced by the parties. At conclusion of all the evidence, proponent first moved for a directed verdict in her favor. She then made a second motion that in event the first motion was overruled, the court should withdraw from the jury any and all issues as to lawful execution of the will and codicils. She then made a third motion to withdraw all issues of undue influence. Thereupon the trial court overruled proponent's first and third motions, and sustained the second. Thereafter, the court instructed the jury that as a matter of law the will and three codicils had been executed in the manner and form required by law and submitted the issues of testamentary capacity and undue influence to the jury, all of which was done in such an all-inclusive, proper manner and form that no complaint is made thereof in this court. In that situation, we are not required to cite or discuss authorities dealing with the factors and elements required to be adduced and considered in disposing of the issues of testamentary capacity and undue influence.

Subsequently, the jury returned a verdict finding that the will and codicils were the last will and testament of Alice Stidworthy, deceased. Judgment was rendered accordingly and contestants' motion for new trial was overruled. Counsel then filed a notice of appeal for both contestants, and perfected an appeal to this court in their behalf. However, contestant Helen S. Kerr subsequently filed a motion in this court to dismiss her name from the appeal, leaving Margaret S. Coryell as the sole appellant, whereupon this court sustained the motion and dismissed the appeal as to Helen S. Kerr. The brief of contestant Margaret S. Coryell filed herein assigned and argued in substance only that the trial court erred prejudicially in the exclusion of certain evidence and in unduly restricting cross-examination of certain witnesses. We do not sustain the assignment.

There are well-established rules which have application here in disposing of Margaret's contentions. In Reynolds v. Knott, 164 Neb. 365, 82 N. W. 2d 568, we reaffirmed that: "A testator may dispose of his property as he pleases. The law does not require that he recognize his relatives therein nor does it put any obstacle in the way of the aged or infirm in making disposition of their property by will; provided, only, that their mentality conforms to the accepted tests at the time of the execution of such testamentary instrument and same was not procured by undue influence."

The mental capacity of a testator is tested by the state of his mind at the time he executed his will. In re Estate of Goist, 146 Neb. 1, 18 N. W. 2d 513. Also, when undue influence is alleged as a defense, the evidence must tend to show undue influence directly in reference to the will in question. In re Estate of Thompson, 153 Neb. 375, 44 N. W. 2d 814. Further, proof of undue influence is generally permitted to take a wide range, but it should be confined to a date ma-

terially corresponding with execution of the will. 94 C. J. S., Wills, § 248, p. 1116, § 245, p. 1107.

In Grosse v. Grosse, 166 Neb. 55, 87 N. W. 2d 900, we reaffirmed that a litigant should not ordinarily be permitted to cross-examine a witness on a matter foreign to the scope of his direct examination. See, also, Zimmerman v. Lindblad, 154 Neb. 453, 48 N. W. 2d 415, wherein we stated the general rule with regard to the limitations of cross-examination, and defined the inclusive meaning and application of the general rule.

In Manley State Bank v. Spangler, 130 Neb. 196, 264 N. W. 459, quoting from Brooks v. Thayer County, 126 Neb. 610, 254 N. W. 413, we held: " 'Under section 20-853, Comp. St. 1929 (now section 25-853, R. R. S. 1943), violation of the strict rule of cross-examination will not be considered ground for reversal unless it clearly results in prejudice to the substantial rights of the party complaining.' "

Also, as stated in 5A C. J. S., Appeal and Error, § 1604, p. 88, citing numerous authorities, several of which are from this jurisdiction: "The exercise by the trial court of its discretion in ruling on the admission or rejection of evidence will generally not be reviewed by an appellate court, unless it is clearly or plainly shown that the trial court abused its discretion.

"Application of this principle has been made to rulings relating to the reception of evidence the admissibility of which turns upon its relevancy, evidence collateral to the main issue, or which bears remotely on issues involved; and to rulings relating to cumulative evidence, opinion evidence, evidence concerning a matter of common knowledge, and evidence which is otherwise competent but is claimed to have a tendency to excite undue prejudice."

In the light of the foregoing rules, we have examined the record. The evidence is voluminous, with separate exhibits made a part thereof. A reading of the record discloses that contestants were permitted on

both direct and cross-examination to go far afield into collateral matters which were incompetent, irrelevant, and immaterial, and not properly a part of this or any other will contest. In that situation we can do no more here than summarize the material relevant evidence from which the jury could have reasonably concluded as it did, and point out why the contentions of Margaret S. Coryell have no merit. In doing so, proponent Ada S. Westover will be called Ada; appellant Margaret S. Coryell will be called Margaret, and her daughter Adele Coryell will be called Adele; Helen S. Kerr will be called Helen; and Alice Stidworthy, deceased, will be called testatrix. When speaking of Margaret and Helen jointly they will be called contestants.

Testatrix was a widow from the time of her husband's death in 1931 until she died in Lincoln on July 9, 1956. Her husband, Doctor Daniel B. Stidworthy, was a physician at Homer where he lived with testatrix until the time of his death. The doctor and his family had a close and trusted friend, one Frank Buckwalter, who will be called Frank. By the time the doctor died, he and Frank as partners had accumulated and owned certain numbered farms, consisting of about 800 or 900 acres in Dakota County. Shortly after the doctor's death, testatrix moved to Lincoln where for almost 25 years she continuously lived in Ada's home until the death of testatrix. In that connection, from 1932 Ada was a widow with two young sons who lived with her until they reached maturity and attained manhood, while testatrix lived with them in a home owned by Ada.

The three daughters of testatrix were graduates of the University of Nebraska. Ada had taken postgraduate work elsewhere and held a master's degree in medical-social work. She had taught at the University of Nebraska for sometime, but was general secretary of the Family Service Association in Lincoln at and for sometime prior to this trial.

Frank generally managed and looked after the farms

owned in partnership with the doctor. Shortly after the doctor's death, the Buckwalter-Stidworthy Corporation, hereinafter called the corporation, was formed, and the partnership lands were conveyed to it. The original officers and members of the board of directors were testatrix, Margaret, and Frank, together with Selma Nelson, one of Frank's employees. There were 1,000 shares of stock issued by the corporation, of which 490 went to testatrix, 10 went to Margaret, and 500 went to Frank, including qualifying shares to his employee. Frank generally managed the corporation and reported at length to the stockholders, who usually voted by proxy. During his lifetime he also generally took care of the business affairs of testatrix.

In the meantime, Margaret's husband had borrowed money from testatrix and thus became indebted to her for $3,000, represented by a promissory note payable to her, dated December 30, 1936, and due December 30, 1946, with interest at 7 percent payable semiannually. Likewise, he became indebted to Ada for $3,000, represented by a promissory note payable to her, dated December 30, 1936, and due December 30, 1946, with interest at 7 percent, payable semiannually, for which a new note was made by him to Ada on May 25, 1948. In that connection, even at time of this trial no part of such notes had ever been paid by Margaret's husband except a small part of interest which had accrued thereon, although sometime before execution of the will of testatrix, dated February 16, 1942, C. Petrus Peterson, a lawyer, had attempted unsuccessfully to make collection thereof. Also, Margaret's husband had taken over the marketing and distribution of Three Daughters, a deodorant prescription prepared by Doctor Stidworthy during his lifetime, and Margaret's husband had failed to make any accounting therefor.

On February 16, 1942, Mr. Peterson, as attorney for testatrix, prepared her will in his office as she alone personally requested, and same was there duly executed

as required by law. As far as important here, such will gave Margaret the unpaid $3,000 note aforesaid which Margaret's husband owed testatrix, together with 10 shares of stock in the corporation then held by Margaret, plus 65 additional shares of such stock. The will also gave 166 shares of stock to Helen, and 166 shares of stock to Ada. It then gave Ada an additional 93 shares of stock "for reasons which I regard as proper and adequate and which I have explained in the letter which will be found with this will." The residue of the estate was given in equal shares to Helen, Ada, and Margaret. The appointment of Ada as executrix was then requested and all wills theretofore made were revoked. It will be noted that testatrix thus bequeathed 500 shares of stock, including 490 shares then owned by her, and 10 shares then owned by Margaret, and that testatrix gave Ada more than the others.

In that connection, Ada was not present when said will was executed, and knew nothing of its contents until it was read in the presence of Helen and Margaret after the funeral of testatrix. At the time of its execution, testatrix orally gave Mr. Peterson her reasons for making the provisions in the will. Such reasons were that she had made her home with Ada for a number of years; that in addition to the unpaid indebtedness aforesaid to herself and Ada, the Coryells had received other financial assistance from testatrix; and that she wanted to do equity between her three daughters, each of whom was equally loved by her. The evidence is overwhelming that testatrix was then of sound mind and disposing memory. In that connection, contestants did not specifically allege in their objections to probate that on February 16, 1942, testatrix lacked testamentary capacity. However, at the trial they adduced some evidence in the nature of conclusions that testatrix then did lack testamentary capacity, and the trial court submitted that issue to the jury.

In April 1949 Frank died, and his stock in the corpo-

ration passed to his brother, Clarence Buckwalter, hereinafter called Clarence, who lived in Chicago. Clarence then took over management of the corporation and trouble developed with its employees who felt that Frank should have given some of his stock to them and that Clarence was not capable of properly managing the corporation. As a matter of fact, he was gravely assaulted by one of the employees. Therefore, he decided to dispose of his stock, and in January 1950, some conversations were had by Ada, Margaret, and an accountant employed by them with regard to purchase of his stock for testatrix, but that failed for want of an acceptable offer. In that connection, contrary to contentions of Margaret, such conversations were properly excluded as incompetent, immaterial, and irrelevant as were also inquiries with regard to negotiations concerning an incomplete exhibit prepared by Margaret and given to the accountant, which document Margaret had admittedly never asked testatrix to sign, which Margaret never gave to Ada or asked her to get testatrix to sign, and which never was signed by her.

In that connection also, Clarence prepared an agreement in his own handwriting, dated March 22, 1950. It provided for a division of the farms and a dissolution of the corporation at an early date; that a deed should be given to testatrix of corporation farms Nos. 6 and 7 with right of Clarence to purchase same any time within 5 years for $30,000 before sale to any other person; and that a deed should be given to Clarence of corporation farms Nos. 8 and 2 with right of testatrix to purchase same any time within 5 years for $30,000 before selling to any other person. It then provided that the balance of the corporation assets should be divided equally after payment of debts and expenses of dissolution. Such an agreement was signed as accepted by testatrix and Clarence, and was witnessed by Ada. However, that agreement, offered in evidence by contestants, was never

consummated because other interested parties did not like such disposition of the corporate property.

Thereafter, Clarence determined to put his stock on the market, and to prevent it from passing into strange hands, Ada purchased Clarence's 500 shares of stock at an agreed price of $65 a share. Mr. Peterson, who had represented Ada in her divorce action in 1931, assisted in arranging the financing thereof, after discussing the matter in detail with testatrix, who agreed that it was desirable and necessary for Ada to acquire the stock in order to prevent it from going on the market and jeopardizing the interests of testatrix and others by a wide distribution of stock ownership. On cross-examination with regard thereto, Mr. Peterson was permitted to testify in detail exactly how such purchase was negotiated and financed by Ada. In that connection, Helen testified that in 1950 Ada stated in her presence and in the presence of testatrix and Margaret that she had bought Clarence's stock. However, Margaret testified that although she had heard of such purchase, she did not know how Ada had purchased the stock until they examined the records after the death of testatrix. Margaret was then asked: "Did you discover where she (Ada) got the money to buy that stock?" Answer: "Yes." Objection to such evidence as immaterial was made and sustained, whereupon contestants made an offer of proof to which objection was made as incompetent, immaterial, and irrelevant, and that the offer was broader than the question. Such objection was sustained. Contrary to Margaret's contention, such objection was properly sustained. The offer was so broad, comprehensive, and inclusive of almost the entire defense of contestants that the trial court was required to sustain the objection. In any event, the record otherwise discloses exactly how the purchase was financed by Ada, and there is no dispute about it. Margaret could not have been prejudiced by the sustaining of such objection.

Shortly after Ada purchased the stock aforesaid from Clarence, the corporation was reorganized, with Ada, testatrix, and Mr. Peterson as officers and directors. Mr. Peterson was given qualifying shares, and he thereafter acted as a director and counsel for the corporation. Ada then became president and manager at an agreed salary of $300 a month which she continuously received, and testatrix became an officer at a salary of $150 a month which she continuously received until the time of her death.

At the time of such reorganization, the 10 shares of stock owned by Margaret were voluntarily endorsed by her in blank and held by testatrix, who surrendered them for a new issue of stock to her for her full stock ownership, including that standing in the name of Margaret, who was not a stockholder of record after reorganization of the corporation and while Mr. Peterson had anything to do with the corporation.

In that connection, Margaret and Helen claimed that testatrix had been thereafter looking for Margaret's stock but could not find it, so on October 16, 1950, they went to Ada's home in her absence and persuaded testatrix to give them the combination to her safe, purportedly to look for Margaret's stock. It is noteworthy that Margaret always had known the combination of the safe, but she had forgotten it. However, testatrix did always admittedly remember it and she gave Margaret the combination. In any event, Margaret and Helen opened the safe and did not find Margaret's stock which had been theretofore surrendered, but they claimed to have found and clandestinely read a will of testatrix whereby each of the daughters was given 166⅔ shares of stock, and Ada's two boys and Adele were each given $1,000. However, neither Margaret nor Helen knew the date of such a will or even whether it had ever been signed and executed by testatrix. When Ada came home and learned what happened, she told them they had no business in their mother's safe or reading

her will, and purportedly said: "We are working on that." However, Ada denied that she made such quoted statement. Nevertheless, Margaret and Helen came back again a few days later, whereat testatrix again gave them the combination, but upon opening the safe they found no papers in it. The fact is that the will executed on February 16, 1942, was delivered by testatrix to Mr. Peterson personally on October 29, 1950, for safekeeping, and he so receipted for it in a memorandum in writing and on the envelope which contained the will.

The first codicil to the will was also prepared by Mr. Peterson in his office as requested by testatrix and same was duly executed as required by law on June 20, 1951, a little less than a year after Ada had purchased Clarence's stock. Such codicil recited that by her last will, testatrix had bequeathed corporation stock owned by her to her three daughters in varying amounts. It then recited that on January 2, 1951, testatrix had entered into a reciprocal agreement with Ada by which the survivor was given an option to purchase all stock in the corporation of the one first dying, not bequeathed to the survivor, at an agreed price of $65 a share. Accordingly, her executor was directed to carry said agreement into effect if testatrix died before Ada, and that if Ada exercised her option, the other legatees in her will should be paid the purchase price of the number of shares bequeathed to them respectively in lieu of stock. In all other respects, testatrix ratified and confirmed her will dated February 16, 1942.

The second codicil was also prepared by Mr. Peterson in his office as requested by testatrix after she had written and sent a letter to him saying that she wanted to sell some of her stock to Ada for $65 a share in order to give Margaret and Adele financial assistance. Such codicil was duly executed as required by law on March 31, 1952. Therein, testatrix recited that during the past year she had given financial assistance to Margaret and Adele which made it necessary for testatrix to

sell 11 shares of stock, for which she realized $65 a share. She recited that in her last will provision had been made for distribution of her stock among her three daughters, but she now directed that 11 shares sold to date and any sold in the future be deducted from the number provided in her will of February 16, 1942, as going to Margaret, leaving undisturbed the number of shares or proceeds thereof going to her other two daughters. She also recited that the letter referred to in said will explaining why the share to Ada was more than the others had been removed as then unnecessary. In all other matters testatrix confirmed her last will dated February 16, 1942, and her first codicil thereto dated June 20, 1951.

The third codicil was also prepared by Mr. Peterson in his office as requested by testatrix after she had written and sent a letter to him saying that she wanted to sell nine more shares of her stock to Ada for $65 a share in order to give Margaret that amount of money as requested by her. Such codicil was duly executed as provided by law on November 3, 1953. Therein testatrix recited that Margaret had urgently requested financial assistance in the sum of $600 for her daughter Adele's wedding. In order to render that assistance, testatrix recited that she had decided to sell nine shares of her stock to Ada at an agreed price of $65 a share. Testatrix then directed that said nine shares be deducted from the number of shares given to Margaret as provided in her will dated February 16, 1942, as modified by her second codicil dated March 31, 1952, leaving the number of shares or the proceeds thereof going to her other two daughters undisturbed. In all other matters testatrix confirmed her last will dated February 16, 1942, and her second codicil thereto dated March 31, 1952.

Mr. Peterson testified that in advising testatrix and in preparing the codicils he relied upon certain letters sent to him and signed by testatrix which appear in the record, and upon conversations which he had with testatrix

and not with Ada, who was not present when the will was prepared and executed and when the codicils were prepared.

The codicils were executed by testatrix and, as requested by testatrix, they were attested by her close friends as witnesses in Ada's home. However, Ada testified that she knew they were then transacting some business with testatrix but that she was not present in the room with them and did not know the nature thereof, · and that she knew nothing of the contents of the will or the codicils until they were read in the presence of Margaret and Helen after the funeral of testatrix. That testimony is supported by some other evidence and was not contradicted by any direct evidence. Mr. Peterson also testified that he saw testatrix from time to time in his office and at her home after he drew her will and codicils and until shortly before her death. He also saw her at annual stockholders' meetings and board of directors' meetings, and testified that she remained fully mentally competent throughout the entire period.

Likewise some 16 near neighbors, close friends, and acquaintances who had seen and visited with testatrix often in her home and elsewhere during periods prior to 1942 and thereafter until shortly before her death, testified that testatrix was entirely competent mentally throughout the entire period. True, testatrix was 83 years old at the time of her death and naturally then and theretofore had some physical disabilities due primarily to advancing age, but the evidence is overwhelming that at all times during preparation and execution of her will and codicils and thereafter, at least until the last part of May 1956, she understood the nature of her acts, the extent of her property, the proposed disposition of it, and the natural objects of her bounty. As a matter of fact, the testimony is overwhelming that during such period testatrix was a handsome woman of small stature, as disclosed by three photographs of her taken as late as May 20, 1956. Oral testimony also affirmed that con-

clusion and attested that testatrix was conservative, loving withal in temperament, and learned beyond the average person during her entire lifetime until her last illness a short time before her death. Her physician, who examined her in September 1950, and a few times thereafter until her last illness, testified that testatrix was of sound mind until that time.

On the other hand, the only evidence contrary thereto was as follows: Margaret testified in substance that testatrix was not mentally sound on June 20, 1951, and March 31, 1952, and did not know or appreciate the nature or extent of her property on February 16, 1942. Helen, who lived elsewhere and only occasionally came to Lincoln, testified that testatrix was not mentally sound in 1951, 1952, or 1953, and was not mentally sound on February 16, 1942, because she did not then know the extent of her property. Another witness for contestants who lived in Springfield, Ohio, expressed no opinion of the mental capacity of testatrix during the years the will and codicils were prepared and executed, but simply said that in May 1955, testatrix had failed physically and mentally. In that connection, it will be noted that testatrix had lived in Lincoln from about 1931 until her death July 9, 1956, and she apparently knew many people there, yet contestants did not produce any such persons to say anything against her mental competency.

Selma Nelson, an employee of the corporation, was called by the contestants. She had known testatrix since 1913 and they had become close friends. After testatrix moved to Lincoln, they corresponded regularly about personal matters and affairs of the corporation and visited with each other over long distance telephone almost every Sunday until 1950, after reorganization of the corporation. However, Miss Nelson was not asked her opinion about the mental competency of testatrix, although she did say that testatrix was very opinionated

on politics and liked to discuss what was going on in the newspapers.

In that connection, Margaret complains here that the trial court erred prejudicially in refusing to permit Selma Nelson to express an opinion as to the value of the land owned by the corporation or the value of its stock. While some questions directed to her made reference to her experience in the real estate business over many years as secretary for Frank who was engaged in that business, Miss Nelson did not testify to any specific contact with, purchases, or sales of comparable land in Dakota County, or with relation to other training in or knowledge of the real estate business in order to qualify her to express an opinion. In fact, she said: "You are asking for my personal opinion, as it would be the same as anybody else, because I am not an appraiser." As a matter of fact also, contestants offered the agreement dated March 22, 1950, between Clarence and testatrix, which proposed to divide between them the real estate owned by the corporation at a total value of $60,000, and said agreement was received in evidence. When it came to the matter of Miss Nelson's opinon of the value of the corporation's stock, no proper foundation whatever was attempted. However, at all times, based on income from the farms, testatrix did not believe that the stock was worth over $50 a share, and at all times was willing to sell at that price but upon the advice and insistence of Mr. Peterson $65 a share was agreed upon and fixed as a proper value. The contention of Margaret aforesaid has no merit.

Ada and testatrix had a joint bank account most of the time here involved. In that connection, contestants offered in evidence microfilm copies of bank ledger sheets purportedly showing activity of the bank account from about May 5, 1949, through March 3, 1952, but such ledger sheets did not disclose either the source of the deposits or the payee of withdrawals. Upon objection as incompetent, immaterial, and irrelevant, the trial

court, upon examining the sheets, said: "I can't read it." It is "an illegible document as to amounts or dates and it is meaningless to the court. I wouldn't understand it." An examination of the sheets by us has verified that statement as true. After asking counsel for contestants his purpose in making the offer, a broad, all-inclusive purpose and theory was stated by him, whereupon the court, contrary to contestants' contention and theory in connection therewith, properly sustained the objection.

Margaret also complains that the trial court erred prejudicially by excluding an exhibit consisting of microfilm copies of the face of some 40 checks signed by testatrix and made payable to divers firms and persons, one of whom was Adele Coryell, between 1946 and 1952. Generally, no endorsements appear thereon to show where, or to whom, or to intelligently show when if ever they were paid. As a matter of fact, Margaret admits in her brief that the exhibit was never offered in evidence by her, but asserts that probably under the circumstances the exhibit would have been excluded if it had been offered. In that connection Margaret was asked: "Do you or any members of your family appear as payee on the check?" To which an objection was made and sustained as "highly improper and incompetent, immaterial, irrelevant, seeking to get before the jury information about an exhibit not yet offered in evidence and which the court, from previous rulings, probably will refuse, and the jury should be cautioned." Contestants then offered to prove by the answer to the aforesaid question facts which were so broad and all-inclusive of conclusions as to be entirely improper and inadmissible as an answer to such question. Thereupon an objection to the offer as irrelevant, incompetent, immaterial, and including conclusions broader than the question, was sustained. In that connection, the checks in any event would have simply been a verification of Mr. Peterson's testimony that testatrix told him she had

paid some of the Coryell family's bills as requested by Margaret for some period of time because Margaret did not want her name to appear on them. That statement had also been made in a memorandum signed by testatrix and sent to Mr. Peterson. Under the circumstances presented here, the rejection of the offer and exhibits was proper in every respect and could not have been prejudicial to contestants. In such respect, Margaret admitted that testatrix had paid her and Adele the $600 mentioned in the third codicil, and had also given them some smaller amounts at different times, but Margaret denied that she had ever made any request of testatrix to pay Coryell bills.

Margaret also complains that the trial court erred prejudicially in excluding a group of exhibits consisting of eight microfilm copies of the face of checks variously dated between May 8, 1951, and July 2, 1952, and signed by testatrix, six of which were made payable to Wynn Westover, one of Ada's sons, and two for smaller amounts which were made payable to Ada. However, generally no endorsements appear thereon to show where, or to whom, or to intelligently show when if ever they were paid. Objection that the offer of such exhibits was incompetent, immaterial, and irrelevant, was sustained. Contestants then made an offer of proof which was so broad, argumentative, and inclusive of conclusions that an objection as incompetent, immaterial, and irrelevant, and broader than the proof, and constituted a conclusion of an argumentative nature sought to be drawn from the evidence, was of necessity sustained. In that connection, apparently Margaret's theory was that proof that testatrix gave money to Ada and her sons while she had then lived with them in their home for more than 20 years, would somehow disprove statements in the will and codicils, and otherwise concerning financial assistance allegedly given the Coryell family by testatrix, who never lived with the Coryells, was never asked to live with them, and never sought or de-

sired to do so. It was never denied that testatrix had given some money to Ada and her sons while they so lived together, and it would be only natural for her to do so. Such an accounting for family funds so given was entirely incompetent, immaterial, and irrelevant, and served no useful purpose in this proceeding.

On cross-examination Ada was asked what her salary was as manager and president of the corporation since 1950. In that connection, it was admitted throughout the trial and never denied that Ada received $300 a month for such services from the time she purchased Clarence's stock and the corporation was reorganized in 1950 to date of this trial. She was also asked how much she had drawn as dividends and expense money from the corporation since 1950, and what salary she was receiving from her employer as secretary of the Family Service Association in 1950. Respective objections that the foregoing questions were improper cross-examination were sustained, and Margaret complains of those rulings as prejudicially erroneous. An examination of the record discloses that such rulings could not have been prejudicial to contestants, and in the light of authorities heretofore cited, we conclude that the trial court did not abuse its discretion in sustaining objections to the questions aforesaid.

This record discloses that the will and codicils here involved continuously carried out a consistent and definite plan from beginning to end. The trial court submitted the issues of testamentary capacity and undue influence in an all-inclusive manner and form entirely favorable to contestants. They had an entirely fair trial and were given every opportunity to present their theory of defense. We find no error in this record which could upon any theory be prejudicial to Margaret. Therefore, we conclude that the judgment should be and hereby is affirmed. All costs are taxed to contestant, Margaret S. Coryell.

AFFIRMED.